UNITED STATES, Appellee,

v.

Roger D. LOCKWOOD, II, Airman Basic,
U.S. Air Force Appellant.

No. 41799.
ACM S25149.

U. S. Court of Military Appeals.

Feb. 14, 1983.

For Appellant: *Captain Neil S. Richman,* USAFR (argued); *Colonel George R. Stevens, Major Willard K. Lockwood* (on brief).

For Appellee: *Major Michael J. Hoover* (argued); *Colonel James P. Porter* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried by special court-martial at Sheppard Air Force Base, Texas, on charges alleging that he had disobeyed an order, committed two larcenies, and forged a promissory note, in violation of Articles 92, 121, and 123 of the Uniform Code of Military Justice, 10 U.S.C. §§ 892, 921, and 923, respectively. Pursuant to a pretrial agreement, he pleaded guilty to all charges and specifications and, after the court had entered findings of guilty, was sentenced to a bad-conduct discharge and confinement at hard labor for 6 months. The convening authority approved the findings and sentence but directed that appellant be confined at the 3320th Retraining Group (CRS), Lowry Air Force Base, Colorado.

The Court of Military Review considered appellant's contention that the court-martial lacked jurisdiction to try the forgery and one of the larcenies, since these offenses had been committed off-base. For varying reasons and in separate opinions, each of the three judges of the court below concluded that the off-base offenses were within the court-martial's jurisdiction. 11 M.J. 818 (1981). Having granted appellant's petition for review of this conclusion, 12 M.J. 187 (1981), we now rule against him.

I

As reflected in a stipulation of fact and in Lockwood's answers during the providence inquiry, he was stationed at Sheppard Air Force Base, Texas. There he and his

roommate had found the wallet of another airman, Charles M. Sage, Jr. The wallet contained a military identification card (DD Form 2AF), a driver's license, a social security card, and other forms of identification, all issued in Sage's name. On July 5, 1980, Lockwood stole the wallet and its contents from his roommate and this taking was the subject of a larceny specification. No attack has been made on the jurisdiction over that offense, which was committed on base.

On July 11, 1980, appellant took the wallet and identification documents off-base to nearby Wichita Falls, Texas. There, by pretending to be Charles M. Sage, he fraudulently obtained a loan of $100 from the Murphy Acceptance Corporation. His receipt of these funds gave rise to a second larceny specification. To evidence the $100 loan appellant executed a promissory note to Murphy Acceptance Corporation in the name of Charles M. Sage and forged Sage's signature. From this act arose the forgery charge.

## II

At one time it was widely assumed that, simply by reason of his military status, a servicemember could be subjected to trial by court-martial for whatever offenses Congress might designate. *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960), appeared to be consistent with this belief, for there the Supreme Court remarked that "[t]he test for jurisdiction, it follows, is one of *status,* namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term 'land and naval Forces,'" *id.* at 240–41, 80 S.Ct. at 300–01; in that case there was no suggestion by the Court that military jurisdiction might be limited by reason of the type of offense involved. *See Gosa v. Mayden,* 413 U.S. 665, 673, 93 S.Ct. 2926, 2932, 37 L.Ed.2d 873 (1973); *Grafton v. United*

*States,* 206 U.S. 333, 348, 27 S.Ct. 749, 752, 51 L.Ed. 1084 (1907).

However, in 1969, the Court announced an additional requirement for jurisdiction—that the offense be "service connected." *O'Callahan v. Parker,* 395 U.S. 258, 272, 89 S.Ct. 1683, 1690, 23 L.Ed.2d 291. There, a majority of the Justices concluded that, at least in peacetime and within the United States and its territories, trial by court-martial can be authorized only for offenses that are "service connected." In construing the power of Congress "[t]o make Rules for the Government and Regulation of the land and naval Forces," U.S. Const. art. I, § 8, cl. 14, the Court referred to its earlier comment that "military tribunals [must be restricted] to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service," 395 U.S. at 265, 89 S.Ct. at 1687, *quoting United States ex rel. Toth v. Quarles,* 350 U.S. 11, 22, 76 S.Ct. 1, 8, 100 L.Ed. 8 (1955); and it employed the test of "*the least possible power adequate to the end proposed.*" 395 U.S. at 265, 89 S.Ct. at 1687, *quoting Toth v. Quarles, supra* at 23, 76 S.Ct. at 8, which quoted *Anderson v. Dunn,* 6 Wheat (19 U.S.) 204, 231, 5 L.Ed. 242 (1821). Writing for the majority, Justice Douglas painted a dismal picture of military justice in order to help justify the restriction being imposed on military jurisdiction.[1]

In *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), the Supreme Court considered whether a general court-martial had jurisdiction over offenses of kidnapping and rape which had occurred on a military reservation in New Jersey.[2] Justice Blackmun's opinion for a unanimous court discussed Relford's crimes in light of twelve factors which had been emphasized in *O'Callahan.* Having noted that some of these same factors were present and others absent in the case then at bar, the Court observed:

[1] Some of the abuses with which he apparently was concerned have been significantly curbed by the Uniform Code of Military Justice and by the Military Justice Act of 1968, Pub.L. No. 90–632, 82 Stat. 1335.

[2] Possibly because of concern about the ramifications of *O'Callahan,* Solicitor General Erwin N. Griswold personally argued *Relford* for the United States.

There are still other significant aspects of the Relford offenses: The first victim was the sister of a serviceman who was then properly at the base. The second victim was the wife of a serviceman stationed at the base; she and her husband had quarters on the base and were living there. Tangible property properly on the base, that is, two automobiles, were forcefully and unlawfully entered.

*Id.* at 366–67, 91 S.Ct. at 655–56. The reference at this point to these "other significant aspects" makes clear that the twelve "factors upon which the Court relied for its result in *O'Callahan,*" *id.* at 365, 91 S.Ct. at 655, were not intended to be exhaustive. Indeed, in *Relford* the Court stressed nine other considerations which relate to military jurisdiction.

In *Gosa v. Mayden, supra,* the Court ruled that court-martial convictions for crimes that had not been service connected would nonetheless be valid if they preceded *O'Callahan.* Thus, although in one sense subject-matter jurisdiction had been lacking, the court-martial conviction was not treated as a nullity.[3]

In *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), the Supreme Court decided that a Federal District Court should not enjoin a pending trial by court-martial on the ground that the charges lacked sufficient service connection to meet *O'Callahan* requirements. Some earlier cases like *Toth v. Quarles, supra,* were distinguished because they involved civilian defendants "who contended that Congress had no constitutional power to subject them to the jurisdiction of courts-martial" and who therefore had not been required to exhaust their remedies in military tribunals before going into a Federal District Court. *Id.* at 759, 95 S.Ct. at 1313. *See also Noyd v. Bond,* 395 U.S. 683, 696 n. 8, 89 S.Ct. 1876, 1884 n. 8, 23 L.Ed.2d 631 (1969).

After mentioning the reluctance to allow a Federal District Court to enjoin a state criminal prosecution, the Supreme Court observed in *Councilman* that

the practical considerations supporting both the exhaustion requirement in habeas corpus and the federal equity rule barring intervention into pending state criminal proceedings except in extraordinary circumstances are similar to those that underlie the requirement of exhaustion of administrative remedies.

420 U.S. at 756, 95 S.Ct. at 1312. Reasoning that "[t]hese considerations apply in equal measure to the balance governing the propriety of equitable intervention in pending court-martial proceedings," *id.* at 757, 95 S.Ct. at 1312, the Court then observed:

We see no injustice in requiring respondent to submit to a system established by Congress and carefully designed to protect not only military interests but his legitimate interests as well. Of course, if the offenses with which he is charged are not "service connected," the military courts will have had no power to impose any punishment whatever. But that issue turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offense has occurred. See *Relford v. U.S. Disciplinary Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971). More importantly, they are matters as to which the expertise of military courts is singularly relevant, and their judgments indispensable to inform any eventual review in Art. III courts.

---

**3.** In light of *O'Callahan's* emphasis on the safeguards of grand-jury indictment and trial by petit jury, the result reached in *Gosa v. Mayden,* 413 U.S. 665, 93 S.Ct. 2926, 37 L.Ed.2d 873 (1973), seems consistent with some other recent precedents concerning the effect of a trial where certain safeguards were lacking. *See, e.g., Northern Pipeline Construction Co. v. Marathon Pipe Line Company,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982); *DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968).

*Id.* at 759–60, 95 S.Ct. at 1313–14 (footnote omitted). The concern with "the distinct military interest" in deterring certain offenses conforms to the Court's recognition in *Parker v. Levy,* 417 U.S. 733, 742, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), that the military community is "a specialized society" which needs its own specialized legal system. *Cf. Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980).

■ Despite a difference in emphasis the majority opinion in *Councilman* has not overruled the majority opinion in *O'Callahan.* Therefore, we still must assume that, no matter what Congress may wish to do, it is barred constitutionally from authorizing a court-martial to try those offenses of servicemembers which are committed in this country in peacetime and are not "service connected." However, the Court's observation in *Councilman* that a determination about service connection involves "matters of judgment that often will turn on the precise set of facts in which the offense has occurred . . . matters as to which the expertise of military courts is singularly relevant"—suggests that the enumeration of "factors" in *Relford* was never intended to provide an exhaustive checklist and that the presence of service connection is not to be determined in a rigid and mechanical fashion.

■ Unquestionably, "it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise," *Toth v. Quarles, supra* at 17, 76 S.Ct. at 5; and "the expertise of military courts is singularly relevant" in determining which offenses affect readiness to fight. Moreover, as we emphasized in *United States v.*

*Trottier,* 9 M.J. 337 (C.M.A.1980), this determination must be made with respect to military conditions and missions that may vary from time to time and from place to place. In determining whether an offense is service connected, a military tribunal now must take into account the requirements for achieving military victory in a period of history when wars may be won or lost in days, if not hours or minutes.

Offenses committed on post have an especially obvious adverse effect on military personnel and operations; and usually the occurrence of a crime on post suffices to establish service connection. *Relford v. Commandant, supra.* However, crimes that occur off-post may also be service connected. *United States v. Trottier, supra.* See also *United States v. Rock,* 49 C.M.R. 235 (A.F.C.M.R.), *pet. denied,* 23 U.S.C.M.A. 632 (1974). Indeed, an act or omission that occurs outside the boundaries of a military enclave often may have significant impact on the security and combat readiness of those within. For example, a servicemember's use of drugs off-base may induce him to commit crimes on base in order to support an expensive habit. Likewise, his use of drugs off-post may lessen a servicemember's ability to handle complicated military equipment or perform important military duties on post. *Cf. United States v. Trottier, supra.*

A State and its citizens may be adversely affected by conduct that occurs outside its boundaries; sometimes the State will seek to punish that conduct.[4] Similarly, a country and its citizens may be injured by activities that take place beyond its frontiers, so it may seek to prohibit that conduct.[5] In

---

4. The Uniform Reciprocal Enforcement of Support Act, which has been generally adopted, Shepard's *Acts and Cases by Popular Names* 1122–23 (1979), authorizes a State to punish a parent outside its borders for failing to support a dependent within the State. *See* especially sections 4 & 5 of the Act. While the Constitution only requires a State to extradite a fugitive, many states have adopted legislation which authorizes the interstate rendition of persons who have never been within the State which seeks to prosecute them. Uniform Criminal Extradition Act, § 6, Shepard's, *supra*

at 1111–12. *See also* Uniform Act to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings § 3, Shepard's, *supra* at 1102.

5. The Sherman Act has extraterritorial effect and prohibits restraints of trade participated in overseas by Americans or foreign nationals if the restraint affects American commerce. *See Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597, 608–10 (9th Cir.1977), and cases cited therein. Other statutes also apply extraterritorially. *See e.g. Blackmer v. United*

like fashion, the conduct of servicemembers which takes place outside a military enclave is service connected and subject to trial by court-martial if it has a significant effect within that enclave.

## III

### A

Against this background, we turn to the Government's threshold contention that, since the defense declined to contest the service connection of the off-base larceny and forgery, appellant now is precluded from claiming that the court-martial lacked jurisdiction to try him for those crimes. We note that, with respect to each of these charges, the judge expressly asked defense counsel whether "you have any issue as to the jurisdiction on that offense" and received a negative answer. This failure to contest on *O'Callahan* grounds the court-martial's right to try appellant probably reflected an understandable belief on the part of Lockwood and his counsel that it would be in Lockwood's best interest to have the off-base offenses disposed of by the special court-martial along with the charges that were clearly service connected.

The argument that appellant is no longer free to contest service connection—an argument expressed persuasively by one of the judges in the Court of Military Review—stems from the grounds on which the Supreme Court relied in *O'Callahan*. There, Justice Douglas emphasized that, in a trial by court-martial, an accused has no right to grand-jury indictment or trial by jury, and that, by restricting Congressional power "[t]o make Rules for the Government and Regulation of the land and naval Forces," the Court was limiting the situations in which an accused would be deprived of these procedural safeguards. However, even in the Federal courts, where grand-jury indictment is constitutionally required by the Fifth Amendment,[6] a defendant may waive indictment. *See* Fed.R.Crim.P. 7(b). Likewise, waiver of trial by jury is authorized in the Federal courts, *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965); *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930), and in most states. Therefore, appellate government counsel now contend that, if the right to grand-jury indictment and trial by petit jury are the principal underpinnings of *O'Callahan* and if these rights may be waived, it should follow that the requirement of service connection can also be waived by an accused servicemember.

In this regard, the Government understandably relies heavily on this observation in the plurality opinion in *Gosa v. Mayden*, *supra* at 673–74, 93 S.Ct. at 2932–33:

> The new approach announced in *O'Callahan* was cast, to be sure, in "jurisdictional" terms, but this was "lest 'cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger,' as used in the Fifth Amendment, be expanded to deprive every member of the armed services of the benefits of an indictment by a grand jury and a trial by a jury of his peers" (footnote omitted). 395 U.S., at 272–273, 89 S.Ct., at 1690–1691. The Court went on to emphasize that the "power of Congress to make 'Rules for the Government and Regulation of the land and naval Forces,' Art. I, § 8, cl. 14, need not be sparingly read in order to preserve those two important constitutional guarantees. For it is assumed that an express grant of general power to Congress is to be exercised in harmony

---

*States*, 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932); *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922). Similarly, American nationals have been prosecuted for treason because of radio broadcasts made overseas during World War II. *D'Aquino v. United States*, 192 F.2d 338 (9th Cir.1951), *cert. denied*, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343 (1952); *Chandler v. United States*, 171 F.2d 921 (1st Cir.1948), *cert. denied*, 336 U.S. 918, 69

S.Ct. 640, 93 L.Ed. 1081 (1949); *United States v. Best*, 76 F.Supp. 857 (DC Mass. 1948), *aff'd.*, 184 F.2d 131 (1st Cir.1950), *cert. denied*, 340 U.S. 939, 71 S.Ct. 480, 95 L.Ed. 677 (1951).

6. There is no Federal constitutional requirement of grand-jury indictment in state courts. *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 292, 28 L.Ed. 232 (1884).

with express guarantees of the Bill of Rights." *Id.,* at 273, 89 S.Ct., at 1691. The basis for the "jurisdictional" holding in *O'Callahan* obviously was the increasing awareness and recognition of the important constitutional values embodied in the Fifth and Sixth Amendments. Faced with the need to extend the protection of those Amendments as widely as possible, while at the same time respecting the power of Congress to make "Rules for the Government and Regulation of the land and naval Forces," the Court, *id.,* at 265, 89 S.Ct., at 1686, heeded the necessity for restricting the exercise of jurisdiction by military tribunals to those crimes with a service connection as an appropriate and beneficial limitation "to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service." *Toth v. Quarles,* 350 U.S. 11, 22, 76 S.Ct. 1, 8, 100 L.Ed. 8 (1955).

■ We prefer not to rest our decision on such grounds, since *O'Callahan* purports to be an interpretation of congressional power under Article 1, § 8, Clause 14 of the Constitution, rather than a construction of Fifth and Sixth Amendment safeguards. However, at the very least, appellant's express refusal to contest service connection justifies drawing any reasonable inferences against him with respect to factual matters not fully developed in the record of trial. Moreover, some of the reasons why an accused may prefer trial of an offense by court-martial, rather than in some other tribunal, may also be reasons for holding that the offense is service connected.[7]

### B

The Government also advances a "pendent jurisdiction" argument, which echoes the opinion of one of the judges in the court below. Appellate government counsel urges that, just as a Federal court considering claims predicated on Federal law may also adjudicate related claims based on State law, *see* Wright, Miller and Cooper, *Federal Practice and Procedure:* Jurisdic-

tion § 3567 (1975), so, too, a court-martial trying an offense which is clearly service connected may deal with other offenses which are part of the same course of conduct, but which otherwise might not qualify as service connected.

■ In the present context, we are reluctant to rely heavily on a theory which is predicated chiefly on considerations of judicial economy and which has been developed for civil, rather than criminal, trials. "Pendent jurisdiction" does not in itself provide an adequate basis for depriving an accused servicemember of constitutional protections to which he would otherwise be entitled in a criminal trial. However, we also recognize that some of the same concerns which support "pendent jurisdiction" are relevant in determining if service connection exists. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

In the present case, Lockwood's theft from his roommate of Airman Sage's wallet provided him with a military identification card and forms of identification which enabled appellant to obtain $100.00 from the Murphy Acceptance Corporation six days later. Probably the on-base larceny of the wallet was only preparation for the subsequent offenses in Wichita Falls and by itself would not have sufficed to establish an attempt to commit those offenses, if they had not been consummated. *Cf.* Article 80, UCMJ, 10 U.S.C. § 880; para. 159, Manual for Courts-Martial, United States, 1969 (Revised edition). Nonetheless, this theft was an essential step in a course of conduct that led directly to the second larceny and the forgery.

Under such circumstances, there are advantages to the accused if the entire course of criminal conduct can be disposed of in one trial and by one sentence. Indeed, an expectation of such advantages may explain the refusal of Lockwood's defense counsel to raise an issue of service connection at trial, for, if successful, he might have

---

7. For example, the servicemember may wish to have all charges against him disposed of expeditiously in a single trial and the Armed Services may also desire to achieve the same result.

prompted a second prosecution in a Texas state court for the forgery and the larceny from Murphy Acceptance Corporation. However, not only Lockwood but also the Air Force had an interest in disposing of his entire course of conduct in one criminal proceeding. Two trials would take longer and would require the presence of the witnesses—some of them military—in two different courts and on two different occasions. Until the criminal proceedings were completed, the military personnel who were witnesses might be unavailable for reassignment. Furthermore, if the accused is punished only by the military authorities, they may keep him available to perform military duties; but if he is sentenced by a civilian court to confinement in a civilian jail, he will be unavailable for such duties.

The Government has an interest in assuring that a servicemember receives an appropriate punishment for his crimes and that, if feasible, he is rehabilitated. When the responsibility for punishing a course of criminal conduct is divided between civilian and military authorities, these goals may be hindered. For one thing, the servicemember is subjected to two convictions rather than one and this may carry adverse collateral consequences which make it more difficult for the accused to be rehabilitated. Since two trials must take place, rather than only one, the accused may undergo two ordeals and remain uncertain about his fate until the second trial is concluded. Commencing a successful rehabilitation program is more difficult until it becomes certain what the accused's punishment ultimately will be; so the commencement of successful rehabilitation may be delayed while awaiting the results of a second trial. Also, the military sentencing and correctional authorities may differ from their civilian counterparts in methodology and in goals; and these differences may complicate the rehabilitation process.

While many legal systems allow joinder in a single prosecution of all connected offenses, *see, e.g.,* Fed.R.Crim.P. 8(a), military justice goes even further and encourages disposition of all charges in a single trial. *See* paras. 30*g* and 33*h*, Manual, *supra; United States v. Krewson,* 12 M.J. 157, 159 (C.M.A.1981). This "customary practice" of joining "all known offenses against an accused and" disposing of them "at a single trial" is explained by "practical reasons of dispatch," *see United States v. Keith,* 1 U.S.C.M.A. 442, 448, 4 C.M.R. 34, 40 (1952); *United States v. Taylor,* 28 C.M.R. 752, 756 (A.F.B.R. 1959).[8] The "practical reasons of dispatch" which have led to the military practice of joining all known offenses in a single trial also help support the conclusion that where related on-base and off-base offenses are involved, there is a military interest in having all the offenses tried by court-martial, so that they can be disposed of together without delay. The existence of this interest, in turn, helps provide a basis for finding service connection for the off-base offenses.

## C

■ Additional reasons exist for finding service connection as to the forgery and larceny which took place off-base. *Relford* stressed "[t]he essential and obvious interest of the military in the security of persons and of property on the military enclave." 401 U.S. at 367, 91 S.Ct. at 656. In the case at bar, appellant initiated his off-base offenses by a larceny committed at Sheppard Air Force Base. The Armed Services have an interest in punishing a crime which is initiated within a military enclave, even if the offense is consummated off-post.

■ Since the Armed Services retain a property interest in a military identification card, appellant's use of Sage's card really involved the use of military property to commit a crime. Thus, his action could be

---

8. Other legal systems also recognize the desirability of allowing all pending offenses to be dealt with at one time. For example, under some circumstances English criminal procedure allows a judge to take into account for sentencing purposes pending offenses other than those for which the defendant is being tried. *See United States v. Green,* 14 M.J. 461 (C.M.A. 1983).

considered a "flouting of military authority." *Id.* at 365, 91 S.Ct. at 655. Moreover, the Armed Services must protect reliance on the military identification card by those who deal with persons purporting to be members of the Armed Services. This card is a means of entry to many facilities and events, and it frequently enables the bearer to obtain services and credit. When a military identification card is debased by its use to perpetrate a crime, the Armed Services have an additional reason for concern.

*Relford* also stressed [9]

[t]he impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission.

While the larceny from the Murphy Acceptance Corporation and the forgery of Sage's signature to a promissory note took place off base, Airman Sage was located on base and, although he may not have been the primary victim of the forgery and theft, *cf. United States v. Uhlman,* 1 M.J. 419 (C.M. A.1976), he was among the victims of these crimes. For one thing, it was foreseeable that as a result of Lockwood's actions, a demand would be made that Sage pay the forged promissory note and if he declined to pay, a suit on the note would be instituted against him. In that event, he would be exposed to the inconvenience—and possibly the expense—of defending himself against the claim and would run the risk of an adverse decision by the trier of fact in the civil action brought by the noteholder. Furthermore, Sage would be exposed to the danger that his nonpayment of the note executed in his name would be included in credit reports without any explanation that he was under no legal obligation to pay the note. Even though, as pointed out in *Uhlman,* a person generally is not bound legally by a forgery of his signature on a note, check, or other legal document, we are sure that, in view of the inconvenience and expense to which he is subjected, a person whose signature has been forged usually considers himself to be a victim of the crime.

*Relford* recognized the importance of "geographical" relationships and it noted that, according to a passage from W. Winthrop, *Military Law and Precedents* (2d ed. 1920 reprint), on which both the majority and dissenters relied in *O'Callahan,* a crime was punishable by court-martial even when committed against a civilian "near" a military post. 401 U.S. at 368, 91 S.Ct. at 657. Thus, while we do not ignore the fact that *O'Callahan* itself involved an off-post crime committed in a city located near several military installations, we consider quite relevant to service connection in the present case the fact—of which we take judicial notice—that Wichita Falls, where appellant committed the off-base forgery and larceny, is in close proximity to Sheppard Air Force Base. Few military enclaves are self-sufficient and usually the servicemembers assigned to a post and their dependents must rely on persons in the surrounding communities for various types of support—such as housing, credit, and recreation. An offense committed by a servicemember near a military installation tends to injure relationships between the military community and the civilian community and thereby makes it more difficult for servicemembers to receive needed local support. In a sense, Lockwood's actions tended to injure the base population at Sheppard Air Force Base.

By mentioning in *Relford* the adverse effect of an on-base crime on the "morale, discipline, reputation, and integrity of the base itself," the Court implicitly recognizes that a military organization has an interest in maintaining a good reputation. By prohibiting in Article 134 of the Uniform Code, 10 U.S.C. § 934, "all conduct of a nature to bring discredit upon the

---

9. 401 U.S. 355, 367, 91 S.Ct. 649, 656, 28 L.Ed.2d 102 (1971). *Relford* also referred to "[t]he recognition in *O'Callahan* that, histori-

cally, a crime against the person of one associated with the post was subject even to the General Article." *Id.* at 368, 91 S.Ct. at 657.

armed forces," Congress also has acknowledged the importance of maintaining the good name of the military establishment. Even though Lockwood's forgery and theft occurred off-base, they nonetheless had an adverse effect on the general reputation of Sheppard Air Force Base and those assigned there.

In a time of increasingly complex and sophisticated weapon systems, intangibles like "reputation" and "morale" are sometimes given little emphasis. However, just as the Supreme Court recognized in *Relford,* they do have an impact "upon the military operation and the military mission." *Id.* at 367, 91 S.Ct. at 656. Recent conflicts have made this abundantly clear. *See, e.g.,* Moodie, *Six Months of Conflict,* 5 Washington Quarterly 25, 30 (Georgetown Univ., Autumn 1982); Luttwak, *On the Meaning of Victory,* 5 Washington Quarterly 17, 22 (Georgetown Univ., Autumn 1982). Indeed, it should be apparent that, for a nation which now relies on an All-Volunteer Force obtained by recruitment and which needs to retain in uniform "career soldiers" skilled in the technology of modern warfare, maintaining the "reputation" and "morale" of the Armed Services is essential. This circumstance cannot be ignored in determining the service connection of off-post offenses.

Admittedly, some of our earlier precedents have attributed little significance to circumstances to which we now attach considerable importance—such as the crime's proximity to a military post and misuse of a military identification card to commit the crime. *See United States v. Hopkins,* 4 M.J. 260 (C.M.A.1978); *United States v. Vick,* 4 M.J. 235 (C.M.A.1978); *United States v. Sims,* 2 M.J. 109 (C.M.A.1977); *United States v. Uhlman, supra.* However, many of these decisions were by divided vote [10] and some were at odds with previous interpretations of *O'Callahan* by our

Court.[11]  Moreover, we believe that our present view conforms more to the Supreme Court opinions subsequent to *O'Callahan.*  In any event, the criteria for service connection should be reexamined periodically in light of changes in the conditions under which the Armed Services perform their assigned missions and the accompanying changes in the impact of off-post crimes upon their ability to accomplish those missions.

IV

■  Since the two off-base crimes committed by appellant were part of a course of conduct which began on base at Sheppard Air Force Base and in light of the impact of those offenses upon persons assigned at Sheppard Air Force Base and the morale, reputation, and integrity of the base itself, we conclude that the court-martial could properly try all the offenses that were referred to it.

Accordingly, the decision of the United States Air Force Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (dissenting):

I believe the majority in this case, has in effect, reconsidered the earlier decisions of this Court in *United States v. Hopkins,* 4 M.J. 260 (C.M.A.1978), and *United States v. Sims,* 2 M.J. 109 (C.M.A.1977), and reached a contrary conclusion.  I cannot fault a court for reconsidering decisions they feel were decided contrary to the law at the time of those decisions.  I do, however, have a problem when the court uses the same decisions available to the former sitting court and arrives at a contrary conclusion without an adequately expressed rationale as to why the earlier decisions were contrary to the law.

---

10.  *See, e.g.,* Judge Cook's dissents in *United States v. Alef,* 3 M.J. 414, 421 (C.M.A.1977); *United States v. Sims,* 2 M.J. 109, 112 (C.M.A. 1977); *United States v. Hedlund,* 2 M.J. 11, 15 (C.M.A.1976); *United States v. Uhlman,* 1 M.J. 419, 421 (C.M.A. 1976).

11.  For example, *compare United States v. Hedlund, supra* at 13 n. 1, *with United States v. Everson,* 19 U.S.C.M.A. 70, 71, 41 C.M.R. 70, 71 (1969); and *United States v. McCarthy,* 2 M.J. 26 (C.M.A.1976), *with United States v. Beeker,* 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969).

If I read the majority opinion correctly, I believe it finds the use of a military identification card *near a military base* injurious to the reputation of the base and a misuse of military property. These findings, as far as jurisdiction is concerned, must be tethered to an initial act on a military base.

This case and those cited above contain facts requiring judicial balancing: Which society, the civilian parent society or the military progeny society, has the greater interest to control criminal acts of persons that disrupt the normal flow of commerce?

In balance, I have no difficulty answering the question as the Court did in *United States v. Hopkins, supra* and *United States v. Sims, supra.* The reasons advanced by the majority for jurisdiction resting in the military society seem to be related more to the question of organizational vanity rather than answering a strict question of law: That is, how will the military justice system appear in the eyes of civilian society? But, after all, which society has more to lose by the acts of the criminal? I cannot equate a loss of face to the criminal disruption of commerce; therefore, I must dissent.