**UNITED STATES, Appellant,**

v.

**Reginal L. SCOTT, 267 63 0304 Yeoman Second Class (E–5) U.S. Navy, Appellee.**

Misc. Dkt. No. 86–0012RM.

U.S. Navy-Marine Corps Court of Military Review.

24 March 1987.

LCDR Alvin L. MCDONALD, JAGC, USN, Appellate Defense Counsel.

Maj JAMES CARLSEN, USMC, Appellate Defense Counsel.

LT LARRY D'ORAZIO, JAGC, USNR, Appellate Government Counsel.

GRANT, Judge:

The charges against Yeoman Second Class Scott at a special court-martial included one specification of conspiracy with a junior petty officer to commit an offense under the Uniform Code of Military Justice (UCMJ) by wrongfully enticing a female to commit acts of intercourse for hire and reward, in violation of Article 81; one specification of violation of a lawful general regulation, paragraph 6(j)(1), SECNAVINST 5370.2H of 24 October 1984, Subj: Standards of Conduct, by wrongfully enticing Ms. Michelle E. Lallement (civilian undercover agent) to engage in acts of sexual intercourse for hire and reward, in violation of Article 92, 10 U.S.C. § 892; and one specification involving the same enticement, in violation of Article 134, 10 U.S.C. § 934. The Article 81, 10 U.S.C. § 881 offense was alleged as an off-base conspiracy. The orders and general article violations were alleged as on-base offenses. Scott moved at trial to suppress the statements of co-conspirator Interior Communication Electrician Third Class Larry D. Ev-

ans on grounds there was insufficient independent evidence to show the existence of a conspiracy, and, further, to dismiss all charges on grounds the court-martial lacked subject matter jurisdiction. The trial judge granted both motions. The Government petitioned for relief under Article 62, 10 U.S.C. § 862. We remanded to the trial judge for purposes of entering essential findings. A summary of the evidence, the trial judge's findings of fact, conclusions of law and clarifying statement, and our decision are set forth below.

## I

### SUMMARY OF EVIDENCE

On 16 January 1986, Ms. Lallement was employed by the Orange County Sheriff's Office and was working as a decoy prostitute in an area of Orlando, Florida, some 6 miles from the Naval Training Center (NTC). She was part of a civilian law enforcement team engaged in the apprehension of persons soliciting sex for hire. At approximately 1100, Scott and Evans pulled up in an automobile. Evans was driving. Scott and Evans discussed with Lallement her one-thousand dollar weekly earnings, and indicated they were preparing to expand their business. Evans stated they could triple her income. Lallement was provided with the phone number to their official office telephone aboard the base and told to call them later that day. The telephone number was to the First Lieutenant's Office, where Scott was the night crew supervisor and Evans worked on the night crew. Lallement placed the initial call at 1500 hours. Evans answered the telephone and instructed her to call back at 1900 that same day. She placed the second call just after 1900 from the Imperial 400 Hotel, located approximately 8 miles from NTC. Both Scott and Evans answered the call. The conversation was taped by civilian law enforcement authorities, and pertinent excerpts are set forth below:

SCOTT: Lieutenant's Office, Scott.

. . . . .

LALLEMENT: Is this Reggie or Larry?
SCOTT: Reggie.

. . . . .

EVANS: Hi, Maria, this is Larry.
LALLEMENT; Hi, oh, you're both on the phone.

. . . . .

LALLEMENT: Am I late?
EVANS: No, only six minutes.
SCOTT: Only six minutes.
LALLEMENT: Six minutes? I'm sorry.

. . . . .

LALLEMENT: Well that ain't bad. So what's up. Me and Terry are registered up here.

. . . . .

EVANS: You told me you wouldn't be there that soon.
LALLEMENT: I know baby but we decided to do it.
EVANS: Okay, ya'll doing it then, right?
LALLEMENT: Yeah.
EVANS: Okay, um . . .
LALLEMENT: We decided to register so we could have a room.
EVANS: Yeah, that's the Imperial 400.
LALLEMENT: Um, hum, room 324.
SCOTT: Okay. What time does production start.
LALLEMENT: Well, what time, do you guys wanta come up and talk to us before we get on a roll or what.
SCOTT: Um, you know, that's business . . .
LALLEMENT: Yeah, business first . . .
SCOTT: Business first . . .

. . . . .

LALLEMENT: What kinda, what kinda money we talking about? Good or . . .
SCOTT: Okay, telephones make me paranoid especially where we are right now and what we are right now.

. . . . .

LALLEMENT: Okay, well what time do you want to come up here.
SCOTT: Uh.

LALLEMENT: Give me a time and I won't have anybody up here. Cause this sounds important to me.

SCOTT: Yeah, if it wasn't important to us, we wouldn't be wasting our time and ...

.  .  .  .  .

SCOTT: Don't waste my time. You can waste alot of s[___] but don't waste my time.

.  .  .  .  .

SCOTT: Well we should be outta here between nine, nine thirty, but gonna go home and change and some stuff, so why don't we make it about eleven.

LALLEMENT: Can we make it about ten. Cause if we do it at ten, we can talk for an hour and I can go hit Whispers after that.

.  .  .  .  .

SCOTT: Yeah because see that'll be pushing it then too. But see you figure you talking Whispers, Whispers is a pleasure baby.

.  .  .  .  .

LALLEMENT: Yeah, but business comes out of pleasure.

SCOTT: Okay, business comes outta pleasure but don't settle for a Volkswagon when you can have a Cadillac ...

.  .  .  .  .

SCOTT: You forgot what side your bread is buttered on and pick out what your priorities are.

.  .  .  .  .

SCOTT: Okay, so, let's go with between ten thirty and eleven.

.  .  .  .  .

LALLEMENT: Just give me a buzz right before so we're all ready.

EVANS: Sure.

SCOTT: You know, you know, so nothings going on ...

LALLEMENT: Yeah.

.  .  .  .  .

SCOTT: You know, you work on that little punctuality bit of yours and then you know, I think everything else will fall in place.

LALLEMENT: Yeah, I'll get on the time, if I'm working for you I'm a good employee.

SCOTT: Okay, that'll work, we'll see.

LALLEMENT: Okay.

SCOTT: Alright then, we'll talk to you then.

When Scott and Evans later arrived at the Imperial 400 Hotel, Scott took the lead and did most of the talking. Evans played the role of the bodyguard, refusing to sit down and nodding his head in agreement with Scott. Their conversation again was taped. Scott advised Lallement that she must avoid undercover officers and that he "had some people implanted inside of OPD which told him everything that came off the street." According to Lallement, Scott stated that he would "set up an apartment outside the base" for them to use, and that the business would come from the "young recruits, 19 year olds from the base that had a lot of money to burn and hadn't been with a woman in a while." Ms. Terry Wagganer, who went with Lallement to the hotel room and was also acting as a decoy prostitute for civilian police authorities, testified that Scott indicated he would set them up in an apartment and that he would send young Navy recruits to them "cause they'd have a lot of money in their pocket, fresh out of boot camp and we could take all their money and get them to borrow more and take that as well." During the conversation, Lallement received a telephone call from a law enforcement agent concealed in an adjacent room. She pretended it was a prospective client. She made it clear for all to hear that her sexual favors would cost $250.00. At the conclusion of the telephone conversation, she turned to Scott and Evans and asked if $250.00 was a fair price. Both agreed it was. Scott further indicated that Lallement and Wagganer were on his "payroll as of right now." Prior to departing, Scott directed Wagganer to stand so she could be physically scrutinized. He advised both Lallement and Wagganer they were to ad-

dress him as "Daddy." He also directed Wagganer to "put Daddy's coat on." She obliged and he kissed her on the cheek before departing. Scott then related that Evans would be in charge in his absence.

Further evidence was introduced of an article appearing in the January 18th edition of a local civilian newspaper. It contained the names and pictures of Scott and Evans and related they were petty officers in the Navy and "believed to be running a prostitution service for Orlando Naval Training Center recruits." The article further stated the two were arrested after attempting to "enlist a police officer posing as a prostitute" during a routine decoy operation.

## II

### TRIAL JUDGE'S FINDINGS OF FACT, CONCLUSIONS OF LAW AND CLARIFYING STATEMENT

The trial judge in dismissing the offenses initially found no "compelling evidence" that the conspiracy existed at the time alleged, and further determined there was only a token compliance with the *Relford* [1] factors, that the Government's case was based almost entirely upon conjecture, and that there was · no connection between Scott's on-base activities and furthering any conspiracy to provide newly graduated Navy recruits with prostitutes for hire. He further determined there was a lack of independent evidence necessary to consider the statements of the named co-conspirator, Evans, allegedly made during the course of the conspiracy.

In response to the 21 August 1986 order of this Court for additional essential findings of fact, the trial judge made the following findings of fact, conclusions of law, and clarifying statement:

### Essential Findings Of Fact

1. All meetings between the accused and representatives of Orange County, Florida, law enforcement agencies took place while the accused was properly absent from Naval Training Center, Orlando, Florida, his assigned place of duty.

2. The testimony of agents Lallement and Wagganer established that any contemplated criminal activity which might be undertaken by the accused did, or would, take place away from military property, or off-base, and at a place not under military control, and within the territorial limits of the United States.

3. In none of the testimony given was there a credible showing of any connection between the accused's military duties and any contemplated criminal activity. The testimony of Petty Officer Wells established that the accused and Evans worked in the same office and that Evans was subordinate in rate to the accused. It is critical to this case that there is virtually no evidence of record that the accused used either his job position or his rate toward any illegitimate activity with Evans.

4. The offenses charged are among those traditionally prosecuted in civilian courts. Indeed, at an RCM 802 conference, it was established that the accused had been tried, convicted and sentenced in Orange County, Florida, on these same or similar charges.

5. No facts were presented, or apparent to the court, which would tend to show a flouting of military authority, or a threat to a military post or property.

6. The testimony of agents Lallement and Wagganer, admittedly derogated by unfortunate and critical lapses in body-bugging equipment, did nothing to establish that the accused and Evans had entered into an illegal agreement, nor that they had committed an overt act in furtherance of such an agreement which in any way was connected to any on-base military activity.

### Conclusions of Law

The facts do not support a conclusion that a conspiracy existed or, if under a tenuous assumption that one was con-

---

**1.** *Relford v. Commandant,* 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

templated, that it had its origin "on post". *United States v. Hedlund*, 2 M.J. 11 (C.M.A.1976). Further, if indeed some form of agreement to engage in illicit activity existed, there was no showing either that the military community or base was threatened, *United States v. Regan*, 7 M.J. 600 (N.C.M.R.1979) or, more particularly, that any unique military interest, distinct from that of local civilian authorities, needs vindication. *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). In sum, viewing the total factual scenario, if indeed an illegal agreement existed between the accused and Evans, its contemplated implementation would not invoke court-martial jurisdiction. *Relford v. Commandant*, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971); *United States v. Lockwood*, 15 M.J. 1 (C.M.A. 1983); *United States v. Swavely*, 15 M.J. 696 (A.C.M.R.1983).

### Clarifying Statement

That the accused and Evans violated Orange County or Florida laws seemed clear to agents Lallement and Wagganer. What activities they may have undertaken or contemplated that would have been violative of the Uniform Code of Military Justice was much less clear from their testimony. Both the words and demeanor of Lallement and Wagganer left the impression that they had a "hunch" as to what future activity might be in the works, but a lot of guess work was involved on 24 June 1984. In sum, there was no establishment of a conspiracy to commit a jurisdictionally addressable offense, and virtually no evidence of "onboard" activities consistent with either the Article 92 or Article 134 allegations.

### III

■ We will address first the subject matter jurisdiction considerations applicable to the conspiracy offense under Specification 1 of the Charge. The trial judge's clarifying statement that "the words and demeanor of Lallement and Wagganer left the impression that they had a 'hunch' as to what future activity might be in the works, but a lot of guess work was involved ..." simply ignores their testimony that Scott and Evans enticed them to agree to provide sexual favors for hire by newly graduated Navy recruits. Any other reading of the evidence is entirely unfounded in fact. The evidence in this regard is unrebutted, and rationalization is not required where there is no credible evidence even suggesting they were less than candid. We consider the trial judge's reference to the witnesses' demeanor only an express statement of that which is implied in any finding, namely that the trial judge was in a position to hear and observe the witnesses. There is no indication of record that he determined the witnesses were unworthy of belief. Equally entirely unsupported by the evidence is the trial judge's finding of fact that "the testimony of agents Lallement and Wagganer ... did nothing to establish that Scott and Evans had entered into an illegal agreement, nor that they had committed an overt act in furtherance of such an agreement which in any way was connected to any on-base activity." The conspiracy between Scott and Evans, the consummation of the object of the conspiracy, and the on-base connection of the conspiracy were established by the initial off-base meeting between Scott and Evans with Lallement; Lallement's agreement to call them later that day at their on-base workspace; the telephone call to the on-base workspace where Scott was assigned duties as night crew supervisor and Evans worked for him; the agreement over the telephone to meet later that same evening; and the subsequent off-base meeting at which Lallement and Wagganer agreed to work as prostitutes for Scott and Evans outside the base with their clients primarily being newly graduated Navy recruits.

■ The only real issue is not the existence of the conspiracy between Scott and Evans and its connection with the on-base activities of Scott and Evans, but whether, as a matter of law, the conspiracy is ser-

vice-connected within the meaning of *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969). The issue does not turn solely on whether the conspiracy and object thereof were consummated off-base. *See United States v. Trottier*, 9 M.J. 337 (C.M.A.1980), for the proposition that off-base offenses may be service-connected. Nor does the issue turn solely on Scott's conviction and punishment[2] by civilian authorities for offenses from which the military offenses arose. Although the *O'Callahan/Relford* criteria are relevant in determining service-connection, such factors were never intended to be an exhaustive list. *See United States v. Lockwood*, 15 M.J. 1 (C.M.A.1983). The gravamen consideration is contained in *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), in which the Supreme Court held that service-connection

> turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts.

420 U.S. at 760, 95 S.Ct. at 1314.

It is self-evident that a conspiracy between petty officers on active duty to provide newly graduated Navy recruits with sex for hire at a location just outside the base not only constitutes disregard for military authority, but would subject young sailors to prosecution and punishment and denigrate the relationship between junior and more senior Naval personnel, resulting in a breakdown of trust, morale, and discipline. As such, contrary to the trial judge's finding, we conclude that Scott's conduct constituted a flouting of military authority. Further, coupled with the adverse publicity generated by a local newspaper article publicizing Scott's activities,

we conclude that the evidence before the trial judge clearly demonstrated Scott's conduct significantly impacted on the security and combat readiness of the base and its military personnel. *See United States v. Lockwood*, 15 M.J. 1 (C.M.A. 1983). *See also United States v. Solorio*, 21 M.J. 251 (C.M.A.), *cert. granted*, —— U.S. ——, 106 S.Ct. 2914, 91 L.Ed.2d 543 (1986). Furthermore, we judicially note that prostitution is a transmitter of venereal disease and the Human Immunodeficiency Virus (HIV), which often leads to the development of the fatal disease of Acquired Immune Deficiency Syndrome (AIDS). This fact was apparently not considered by the trial judge although such matters are common knowledge and may be unilaterally judicially noted by a trial judge, upon proper notification, where the court's jurisdiction is in issue. In this regard, that Scott solicited a decoy prostitute working undercover and his scheme was therefore destined to fail from the outset does not lessen the threat to the security and combat readiness of the military installation occasioned by his criminal activities. Service-connection, under the circumstances of this case, is not determined solely from the perspective of the actual success of the endeavor, but must necessarily turn on the existence of the conspiracy and the probability that the ultimate purpose of the conspiracy would have been accomplished but for an intervening cause. Otherwise, Scott would be rewarded for his blunder in approaching a government agent and the military would be stymied in the prosecution of a person who engaged in conduct which by its very nature and intended consequences threatened military security and impaired combat readiness. Finally, the military authorities are not required to defer to the conviction and sentence meted out by state authorities for misconduct from which military offenses arise, where, as in the instant case, the civilian punish-

---

**2.** Scott pleaded "no contest" in Orange County Court, Orlando, Florida, to offenses of (1) offering to secure another for purposes of prostitution; (2) offering to receive another for purposes of prostitution; and (3) conspiracy to live off the proceeds of a prostitute. He was sentenced to 2 years supervised probation, 100 hours of community service, and a $1,000.00 fine.

ment did not take into account the adverse impact of Scott's actions on morale, discipline, security and combat readiness of military personnel; the military interest in deterring such offenses was distinct from and greater than those of civilian society because the objects of the prostitution ring were primarily targeted to be newly graduated Navy recruits; the operation was directed by active duty petty officers whose working relationship was that of superior-subordinate and who abused that relationship and trust while on duty in facilitating the object of their conspiracy; and the illicit enterprise was intended to operate adjacent to the military installation as a visibly defiant statement against military authority. As such, we conclude that all the evidence proffered by the Government in support of proving the off-base conspiracy and sustaining subject matter jurisdiction, including the testimony regarding statements made by Evans, a named co-conspirator, during the course of the conspiracy,[3]

---

**3.** The trial judge ruled as inadmissible the statements of Evans, a co-conspirator, holding the independent evidence was insufficient to establish the existence of the conspiracy at the time Evans allegedly made such statements to Lallement and Wagganer. A literal reading of Military Rule of Evidence (Mil.R.Evid.) 801(d)(2)(E), provides:

(d) *Statements which are not hearsay.* A statement is not hearsay if:

. . . . .

(2) *Admission by party-opponent.* The statement is offered against a party and is ... (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

The rule makes no reference to any further requirement for proof of independent evidence of the conspiracy as a condition precedent for the admission of the statements of the co-conspirator. In this regard, the Analysis to Mil.R. Evid. 801(d)(2)(E) refers only to past military practice under a similar rule in the Manual for Courts-Martial, United States, 1969 (Rev.), paragraph 140, which required proof of independent evidence, citing *United States v. Duffy,* 49 C.M.R. 208 (A.F.C.M.R.1974), in support thereof.

The Supreme Court addressed the issue in *Glasser v. United States,* 315 U.S. 60, 74, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and held that the declarations of co-conspirators "are admissible over the objection of an alleged co-conspirator, who was not present when they were made, only if there is proof aliunde that he is connected with the conspiracy.... Otherwise, hearsay would lift itself by its own bootstraps to the level of competent evidence." 315 U.S. at 74, 62 S.Ct. at 467, 86 L.Ed. at 701. However, the continuing validity of *Glasser* was questioned, albeit not rejected, in *United States v. Martorano,* 561 F.2d 406 (1st Cir.1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978), where the First Circuit Court of Appeals suggested that

under any view of the law [the court] would ... require significant independent evidence of the existence of the conspiracy, deviating from the *Glasser* practice only to the extent of permitting the district court to consider the independent evidence in the light of the color shed upon it by the highly trustworthy and reliable portions of the hearsay utterance seeking admission. This approach would afford the criminal defendant most of the protection provided by *Glasser,* yet give free play to Rule 104(a)'s policy of recognizing the trial judge's ability to assess the weight to be given otherwise inadmissible evidence.

561 F.2d at 408. The *Martorano* Court, nevertheless, rested its decision upon its view that the independent evidence established the existence of a concerted mutual venture and further noted that the Second, Third, Fourth, Fifth and Eighth Circuit Courts of Appeal have assumed *Glasser* is still valid notwithstanding the new Federal Rules of Evidence. That *Glasser* remains the majority rule is evidenced in the dissent of Justice White, with whom Justice Brennan joined, from the Court's denial of a petition for writ of certiorari to the United States Court of Appeals for the Sixth Circuit in the case of *Means v. United States,* 469 U.S. 1058, 105 S.Ct. 541, 83 L.Ed.2d 429 (1984). In *Means* the Supreme Court declined to reverse the decision of the Sixth Circuit which held that the existence of a conspiracy may be established by a preponderance of evidence consisting of independent evidence "viewed in conjunction with the [hearsay] statements made by [the co-conspirator] concerning [petitioner's] participation." *Id.* Justice White's dissent alludes to the minority rule status of the *Means* decision as it relied upon the "challenged statements to support the existence of the conspiracy pursuant to which those statements were introduced." *Id.* He further cited a plethora of circuit courts of appeal decisions following the *Glasser* majority rule, and opined that the Court should resolve the conflict and further determine whether a "preponderance of the evidence" or "substantial evidence" should be the standard of proving the conspiracy as a condition precedent to admitting the statement of the co-conspirator. 469 U.S. at 1060, 105 S.Ct. at 542, 83 L.Ed.2d at 429.

Given the emphasis in the new military rules of evidence on the importance of trustworthiness in evaluating evidence that would otherwise be inadmissible under past military practice, we prefer the *Martorano/Means* rationale

were admissible, credible, and unrebutted, and the trial judge's bases for dismissing the conspiracy offense, in the particulars set forth above, were wholly unsupported by the evidence and erroneous as a matter of law. *United States v. Burris*, 21 M.J. 140, 144 (C.M.A.1985).

In regard to the trial judge's dismissal of Specifications 2 and 3 of the Charge on grounds there was "virtually no evidence of on-board activities consistent with either the Article 92 or Article 134 allegations," his action was factually unsupported by the evidence and erroneous as a matter of law. The telephone call to Scott's on-base workspace, alluded to above, which is the basis for the offenses charged, may not be viewed in a vacuum in determining service-connection, but must be considered as part of an integrated transaction involving Scott's intent to entice Lallement and Wagganer into prostitution outside the base with newly graduated Navy recruits. The same rationale applicable to the service-connection of the conspiracy offense is equally applicable here, as well as additional considerations involving the violation of a lawful general order, *United States v. Fuller*, 2 M.J. 702, 703 n. 3 (A.F.C.M.R.1976), *pet. denied*, 2 M.J. 222 (C.M.A.1977), and the general principle affirming the service-connection of on-base misconduct. *Relford v. Commandant*, 401 U.S. at 369, 91 S.Ct. at 357.

Accordingly, the decision of the trial judge in dismissing the offenses is reversed and the case is remanded to the Judge Advocate General for return to the trial court for further proceedings not inconsistent herewith.

Chief Judge GORMLEY and Judge RILEY concur.

for resolving such matters. However, we need not address the issue of "bootstrapping" in this case, as the statements of Evans made to Lallement and Wagganer were uttered in the presence of Scott who was acting in concert with Evans at the time in pursuing the unlawful enterprise of pandering. As such, the independent evidence aliunde the statements of co-conspirator Evans established the existence of the concerted mutual venture, thereby providing a factual predicate for the admission of Evans' statements made during the course and in furtherance of the conspiracy consonant with the most restrictive interpretation of Mil.R.Evid. 801(d)(2)(E). *See United States v. Gutierrez*, 576 F.2d 269 (10th Cir.1978). The trial judge's failure to recognize the admissibility of Evans's statements reveals a material deficiency in his findings, conclusions, and rationale in regard to his ruling that the court-martial lacked subject-matter jurisdiction, and further warrants the corrective action taken herein.