UNITED STATES, Appellant,

v.

Charles M. POSTLE, 234 04 8380, Airman Recruit (E–1), U.S. Navy, Appellee.

Misc. Dkt. No. 85–01.

U.S. Navy-Marine Corps Court of Military Review.

Decided 8 April 1985.

**634**

LTCOL M.W. Lucas, USMC, Appellate Defense Counsel.

MAJ Michael E. Canode, USMC, Appellate Defense Counsel.

LT David O. Vollenweider, III, JAGC, USNR, Appellate Government Counsel.

BARR, Judge:

This Government appeal, filed pursuant to Article 62(a)(1), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 862(a)(1), and Rule for Courts-Martial (R.C.M.) 908(b), comes to us for review of an interlocutory ruling of the military judge which excluded evidence that is substantial proof of a fact material in the proceeding below. The threshold requirements of the codal and R.C.M. provisions having been apparently met, we turn to a consideration of the specified issue:

WHERE THE UNDERLYING FACTS, ON WHICH A MILITARY SEARCH AUTHORIZATION WAS BASED, WERE PROVIDED BY A KNOWN MILITARY WITNESS IN A SWORN STATEMENT TO A NAVAL INVESTIGATIVE SERVICE AGENT, AND THE SEARCH AUTHORIZATION WAS FACIALLY VALID, DID THE MILITARY JUDGE ERR BY SUPPRESSING THE FRUITS OF THE SEARCH?

I

The verbatim record of the proceedings submitted on this issue reveals the following evidence available to the military judge for its resolution. On 4 June 1984, Airman Apprentice (AA) Draughn observed appellee open a drawer in his (appellee's) rack locker and remove therefrom a brown box, measuring about 5 inches by 8 inches. Appellee then removed a 1 inch square plastic bag containing a white, flaky substance from the box and placed it in his pocket. AA Draughn also observed 15 to 20 other plastic packets of similar appearance in size, color, and content in the box. The box, with its remaining bags, was returned to the drawer and the drawer closed. Appellee thereafter left the berthing space. During the entire period of this observation, AA Draughn stood approximately 2 to 3 feet from appellee. Shortly thereafter, AA Draughn was called to the Master-at-Arms office to be interviewed concerning thefts in the same berthing space. It is to be noted that AA Draughn was interviewed as a potential victim—not as a suspect. A stipulation of the testimony of the Master-at-Arms conducting the larceny investigation indicates that AA Draughn may have been advised, during the above interview, that appellee was a suspect in that investigation. AA Draughn did not report his

observation of appellee's conduct in the berthing area to the Master-at-Arms at this time.

The evidence reveals that, shortly after AA Draughn initially departed the Master-at-Arms office, he returned and disclosed to those officials the aforementioned details of his observation of appellee's conduct in the berthing compartment. Additionally, AA Draughn stated that the white flaky substance looked like methamphetamines, a drug he had seen before in Detroit being used by persons of his acquaintance.

Naval Investigative Service Special Agent (SA) Davis was called to interview AA Draughn concerning the revelations implicating appellee in the possession of drugs. At that interview, AA Draughn related the same circumstances of the above observation and the basis for his identification of the white flaky substance, which he described as " 'crystal', an upper, which is also called 'crank'." AA Draughn's oral statement was reduced to writing and was sworn to and signed by him.

SA Davis testified that he related the information provided by AA Draughn to the ship's lawyer and was advised that, because the information was current, and in order to interdict any possible trafficking in the suspected substance, a search authorization should be sought. SA Davis typed up both an affidavit, which set forth all the information related by AA Draughn, but not AA Draughn's identity, and a search authorization. Both documents were reviewed by the ship's lawyer, and SA Davis subscribed to the affidavit under oath. According to SA Davis, when he approached the commanding officer to obtain a search authorization, the commanding officer had "pen in hand" and was ready to sign the authorization. Notwithstanding this apparent willingness of the commanding officer to sign the authorization, SA Davis spent 3 to 4 minutes relating to the commanding officer the facts then known and upon which the search was being requested. The commanding officer

was further apprised that AA Draughn made his accusation under oath, that the only information available concerning the identity of the white flaky substance was the statement of AA Draughn, that based on a review of NIS files and negative information from the ship's investigator AA Draughn did not have a history of discipline or reputation on board the ship which would have made his statement inherently suspect, and that these underlying factors, as well as the affidavit and the search authorization request, were reviewed by the ship's lawyer. In the words of SA Davis, he went over the facts with the commanding officer "probably more quickly than I would have like to have, but I think in sufficient detail for him to have made the decision." Though it appears from the testimony of SA Davis that he did not disclose the identity of AA Draughn to the commanding officer during this conversation, but merely referred to Draughn as the informing crewmember, the evidence is not conclusive on this matter. Furthermore, it must be concluded, in light of the evidence adduced at trial, that AA Draughn did not appear personally before the commanding officer in order for the latter to make his own independent assessment of AA Draughn's veracity or to inquire further into the factual basis for Draughn's accusation. Revealed through the testimony of SA Davis at trial, and, therefore, we might presume was either made known to, or not discussed with, the commanding officer at the time of the search authorization request, was the additional fact that Davis did not talk with Draughn's superiors or review his service record to obtain some insight relative to the latter's character. In short, no information concerning AA Draughn's veracity was addressed to, or requested by, the commanding officer.

Though made obvious by the nature of the proceedings now before this Court, the search was conducted pursuant to the authorization and approximately 0.9 grams of methamphetamines were seized from the brown box found in appellant's rack locker.

## II

Before proceeding further, we deem it advisable to set forth the powers possessed by this Court in acting upon a Government appeal. In contrast to the broad fact-finding powers granted to us by Article 66(c), UCMJ, 10 U.S.C. § 866(c), for the resolution of cases submitted for review pursuant to that Article, we are limited, in determining an appeal filed under Article 62(a)(1), UCMJ, to "act only with respect to matters of law." Article 62(b), UCMJ, 10 U.S.C. § 862(b). We, thus, must accept and adopt those findings of fact, if any, entered by the military judge as the facts of the case and resolve the legal issue based solely on those facts—unless the facts found are clearly erroneous. Reversal of an interlocutory ruling of a military judge can only result where that judge committed an error of law.

Dramatic changes in the procedures governing military courts-martial have been occasioned with the promulgation of the *Manual for Courts-Martial, 1984* and the Rules for Courts-Martial. As they pertain to the pretrial motions phase of a trial, there are two changes of utmost significance—at least in their direct relation to the present appeal. Reference has previously been made to the first change, that is, the Government right, pursuant to Article 62(a)(1), UCMJ, and R.C.M. 908(b), and the statutory limitations appurtenant thereto, to seek an appeal from an adverse interlocutory ruling entered by a military judge. The second major change, which declares the *mandatory duty* of the military judge to articulate the basis for his decision on such an interlocutory ruling, is found in R.C.M. 905(d):

> *Ruling on motions.* A motion made before pleas are entered shall be determined before pleas are entered unless, if otherwise not prohibited by this Manual, the military judge for good cause orders

that determination be deferred until trial of the general issue or after findings, but no such determination shall be deferred if a party's right to review or appeal is adversely affected. Where factual issues are involved in determining a motion, the military judge shall state the essential findings on the record.

In the technical sense, the only right of appeal known in military court-martial practice is vested in the Government by virtue of Article 62(a)(1), UCMJ, and R.C.M. 908(b). When these referenced provisions are read, in light of their symbiotic relationship, in concert with R.C.M. 905(d), it becomes abundantly clear that the timing requirement for resolution of motions is, in part, predicated on preserving to the Government the right to appeal from an adverse ruling on such motion.[1] It is, therefore, also correct to conclude that the military judge is required to state the essential findings which served as the basis for his decision on any pretrial motion— which includes any motion granted which excludes "evidence that is substantial proof of a fact material in the proceedings" and as to which decision the Government seeks an appeal under Article 62(a)(1), UCMJ.[2]

We extend our discussion of the threshold question of *when* the duty of a military judge to enter essential findings arises one step further in order to dispel any misconceptions that may evolve from indiscriminately applying the procedural rules governing special findings, as provided for in Article 51(d), UCMJ, 10 U.S.C. § 851(d), and R.C.M. 918(b), to the requirements of R.C.M. 905(d).[3] The law has been, and is, that special findings entered incident to a general finding on the issue of guilt or innocence are not required if the accused is acquitted of the offense(s) as to which such findings were requested. R.C.M. 918(b); *United States v. Burke*, 4

---

1. *See*, C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 194 (1982).

2. The duty of the military judge, of course, also applies in the latter circumstance even if the Government chooses not to appeal.

3. The requirements of R.C.M. 905(d) are particularized as to suppression motions in Rules 304(d)(4), 311(d)(4), and 321(f), Mil.R.Evid.

M.J. 530 (N.C.M.R.1977); *United States v. Hussey*, 1 M.J. 804 (A.F.C.M.R.1976).[4]

▮ The conclusion could be entertained that, because "special findings" are not required where the Government's proof fails to establish an accused's guilt, then, by the same analysis, "essential findings" are not required if the Government fails to prevail on a pretrial motion. Such a generalization is wholly incorrect. It is only when the ruling on such motion "is, or ... amounts to, a finding of not guilty"[5]—and as to which the Government has no right to appeal—that essential findings under R.C.M. 905(d) need not be entered. As to any other ruling which grants or denies a pretrial motion, whether adverse to the Government or an accused, the military judge must set forth the essential findings which form the basis of the ruling.

Having determined when the duty to enter essential findings under R.C.M. 905(d) arises, we next turn to a consideration of the question: To what matters does the term "essential findings" extend? A plain reading of the words used in R.C.M. 905(d) would suggest that the scope of the rule *may* be limited to only a recitation of those facts found, based on the evidence introduced, which support the decision. If the rule be so limited, it is important to consider the distinction between the evidence of record and the specific facts which must be found in order to support the legal ruling. The principle was articulated by the United States Supreme Court in the early case of *Norris v. Jackson*, 76 U.S. (1 Wall.) 125, 126, 19 L.Ed. 608, 609 (1869), wherein the Court defined the term "special findings" as:

... a statement of the ultimate facts on which the law of the case must determine the rights of the parties, and not the evidence on which those ultimate facts are supposed to rest.

▮ That the above definition applied to "special findings," and not "essential findings," should be of no moment in that there exists a clear relationship between R.C.M. 918(b), governing special findings, and R.C.M. 905(d) which more than suggests that the definitional concept of one be applied to the other. Thus, at a minimum, we can state that R.C.M. 905(d) requires that, as to every motion raised pursuant to that general rule, the military judge must recite on the record those ultimate facts—that is, the "essential" facts—which, when gleaned from all the evidence produced upon the issue, he has found to support his decision.[6]

We next must determine whether the requirements of R.C.M. 905(d) extend beyond a mere recitation of the facts found. We quite candidly state that, as to military practice, we approach this inquiry without the benefit of prior precedent interpreting or applying the rule at issue. We are not, however, without guidance on the matter. Article 51(d), UCMJ, dealing with "special findings," has been a part of military jurisprudence since the effective date of the Military Justice Act of 1968. While the cases interpreting that Article, and its initial promulgation within the *MCM, 1969 (Rev.)*, in paragraph 74i, are not legion, we are able to obtain some degree of consistent insight into its reach. We, furthermore, know that Article 51(d), UCMJ, was intended by Congress to be a mirror image of Rule 23(c), Federal Rules of Criminal Procedure (Fed.R.Crim.P.). Thus, federal civilian court precedent is a legitimate source of instruction as to the meaning of the terms "finding of facts specially" and "findings of fact appear therein" as found in Article 51(d), UCMJ. Without recounting the exploration of our inquiry on this subject in detail, we can state certain conclusions that—notwithstanding the apparent limitations contained within the words "findings of fact"—serve to define and con-

4. Though decided under Paragraph 74i, *Manual for Courts-Martial, 1969 (Rev.), (MCM, 1969 (Rev.))*, the statutory basis for the cases cited, that is, Article 51(d), UCMJ, remains unchanged.

5. *See* Article 62(a)(1), UCMJ.

6. The requirement of R.C.M. 905(d) applies, as well, to all motions specifically raised under R.C.M. 905–907.

fine these terms of art. The purposes which Rule 23(c), Fed.R.Crim.P.—and, hence, Article 51(d), UCMJ, and Paragraph 74*i*, *MCM, 1969 (Rev.)*—were designed to serve have been succinctly summarized in *United States v. Falin*, 43 C.M.R. 702 (A.C.M.R.1971), in the following words:

> Special findings are to a bench trial as instructions are to a trial before members. Such procedure is designed to preserve for appeal questions of law. *Cesario v. United States*, 200 F.2d 232, 233 (1st Cir.1952). It is the remedy designed to rectify judicial misconceptions regarding: the significance of a particular fact, *Wilson v. United States*, 250 F.2d 312, 325 (9th Cir.1958); the application of any presumption, *Howard v. United States*, 423 F.2d 1102, 1104 (9th Cir.1970); or the appropriate legal standard, *United States v. Morris*, 263 F.2d 594 (7th Cir. 1959).

*United States v. Falin, supra,* at 704. Accord, *see United States v. Hussey, supra.* Thus, requested special findings which would serve any of these purposes would seem to be embraced within the requirements imposed by Article 51(d), UCMJ. All service Courts of Military Review have adopted this analysis.

The military courts have, however, split on the question whether special findings were mandated, when requested, on interlocutory questions such as those raised by motion to dismiss. Compare *United States v. Ericson*, 13 M.J. 725 (N.M.C.M.R.1982), and *United States v. Kressin*, 2 M.J. 283 (A.F.C.M.R.1976), *rev'd*, 5 M.J. 393 (C.M.A. 1978) (on separate issue), with *United States v. Baker*, 47 C.M.R. 507 (A.C.M.R. 1973), and *United States v. Falin, supra.* Any debate on this point has clearly been rendered moot by the adoption of R.C.M.

905(d). As to pure questions of law which, in a members case, the military judge, as the sole source of the law, would resolve, the pre-RCM military cases were consistent in finding such questions to be not a proper subject for special findings. *See United States v. O'Quin*, 16 M.J. 650, 652 n. 2 (A.F.C.M.R.1983), *United States v. Ericson, supra; United States v. Kressin, supra.*[7]

Finally, the statutory language of Paragraph 74*i*, *MCM, 1969 (Rev.)*, delineated three specific areas in which special findings are required: "findings as to the elements of the offenses of which accused may be found guilty, findings on the question of mental responsibility if raised by the evidence, and findings on special defenses reasonably in issue."[8]

A paradigm which serves to define the reach of the term "findings of fact" as expressed in Article 51(d), UCMJ, has thus been established by prior military and federal case law. The question to be addressed is whether, due to the similarity of employed terms—"findings of fact" in R.C.M. 918(b) and "factual issues" and "essential findings" in R.C.M. 905(d)—the purpose and scope of the former can be translated as the paradigm for the latter. Little assistance in answering this question is obtained by recourse to the drafters' analysis of R.C.M. 905(d). We are advised merely that the rule is based on, and is conceptually identical with, Rule 12(e), Fed.R. Crim.P. In truth, but for conforming language to render the transfer applicable to military terminology and procedure, the rules are identical. Due to its recent advent in military law, there exists no published military precedent discussing the scope and/or requirements of R.C.M.

---

**7.** *See* R.C.M. 801(a)(4) and (5), (e)(1)(A), and (e)(5), and the discussion and analysis thereto, concerning questions of law, interlocutory questions, and questions of fact. As a *general* example of the distinction between legal conclusions and questions of law, it is not required that a military judge explain his ruling admitting evidence during the trial on the merits, but it may be necessary that he set forth the use of that

evidence, if requested, in entering special findings.

**8.** As a matter purely of historical interest, the requirement that special findings be entered on the issue of mental responsibility can be traced back to at least as early as 1824. *See* Winthrop, *Military Law and Precedents* 386 (Reprint, 1920).

905(d).[9] Extant federal law, interpreting Rule 12(e), Fed.R.Crim.P., though not voluminous, does support the view that the stating of findings of fact and conclusions of law is at the core of that Rule's meaning. *United States v. Comosona,* 614 F.2d 695 (10th Cir.1980).

By reading Rule 12(e), Fed.R.Crim.P., in the context of the entire Rule 12, we can distill those factors which become distinct, and those of similarity, when compared with Rule 23(c), Fed.R.Crim.P.—and its military counterpart, R.C.M. 918(b).

Rule 12(b), Fed.R.Crim.P., sets the outer limits of what matters are subject to the requirement of Rule 12(e) for stating "essential findings." If the issue raised prior to trial by motion—or prior to pleas under R.C.M. 905(d)—is "capable of determination without the trial of the general issue," then Rule 12(e) requires its resolution at that early stage, with essential findings entered as necessary. At the other end of the "findings" spectrum is Rule 23(c), requiring the entering of "special findings," upon request, as it relates to the general issue of guilt or innocence. As one commentator has observed, the rules distinguish "between the issue of guilt or innocence, for which a jury is required, and issues affecting the government's right to prosecute for which no jury is needed." [10]

Viewed in this light, we can conclude that Rules 12(e) and 23(c), Fed.R.Crim.P.—and, hence, R.C.M. 905(d) and 918(b), respectively—merely state different timing requirements for accomplishing a desired result—the statement on the record of the reasons of a trial judge, or military judge, for his decisions. This conclusion is reinforced when it is remembered that the timing requirement of Rule 12(e), Fed.R. Crim.P., serves two major purposes—conservation of trial resources and preservation of the Government right to appeal—both of which would be ill-served, if not rendered meaningless, by any different interpretation. Removing this analysis from the realm of the theoretical, and testing it within the confines of military procedure and the interests to be served by that procedure, the symbiotic relationship adverted to above becomes clear. Under any motion raised by R.C.M. 905, 906 and 907 [11]—with one possible exception—its denial does not of itself reach the issue of guilt or innocence. Furthermore, while the exclusion of evidence might ultimately be result determinative in this regard, this effect—and any consequent termination of the proceedings—is collateral to the decision to grant or deny the motion. At a minimum, any order or ruling which would create in the Government a right under R.C.M. 908 to appeal is embraced within R.C.M. 905(d). When such motions are raised before pleas, the military judge must state his essential findings on the record.

The exception referenced above deals with the newly recognized right on the part of the Government and or defense to raise a motion in *limine.*[12] To the extent that such a motion requires a determination of the admissibility of evidence, the use of evidence at trial, or whether a defense would lie, it becomes inextricably intertwined with the trial of the general issue and the evidence introduced on that issue. Thus, even though raised before pleas, such motions ordinarily should not be prematurely decided at that stage.[13]

---

**9.** The lack of published precedent also applies to the scope of Rules 304(d)(4), 311(d)(4), and 321(f), Mil.R.Evid., all of which contain the identical language, and thus must be viewed as possessing a synonymy in interpretation, found in R.C.M. 905(d). This is understandable because the aforementioned rules of evidence are encompassed within R.C.M. 905(b)(3), to which R.C.M. 905(d) applies.

**10.** *See,* C. Wright, *supra* § 194.

**11.** This same rationale applies to Rules 304(d)(4), 311(d)(4), and 321(f), Mil.R.Evid.

**12.** *See,* R.C.M. 906(b)(13).

**13.** It should be recognized that this is a general statement and, thus, exceptions to this exception may arise. We make no attempt to deal exhaustively with this subject. The principle stated in R.C.M. 905(a) regarding treating a motion for its substance, and not its form, governs.

Does this mean that, as to such motions *in limine*, a military judge would never have to explain his reasoning and set forth its considerations, factual predicates, and reasons? Clearly, no. If the case is tried before military judge alone, an explanation of such evidentiary decisions can be reached by a request—entered by the Government or the defense—for special findings under R.C.M. 918(b). If the case is tried before members, requests for, or objections to, instructions will serve the same purpose.

Remaining as matters upon which a "reason" for a ruling is desirable are whether the elements of the offense were proven and by what evidence, whether a defense was reasonably raised by the evidence and grounds for rejecting same,[14] and whether, and for what reasons, a sanity and/or competency issue had been made. In a judge alone case, this is the realm for special findings. *See* Paragraph 74*i, MCM, 1969, (Rev.),* and analysis to R.C.M. 918(b). In a members case, it is the instructions which convey a sense of the consideration given to each matter.

As Rule 12(e) and 23(c), Fed.R.Crim.P.— and R.C.M. 905(d) and 918(b), and Rules 304(d)(4), 311(d)(4), and 321(f), Mil.R.Evid.— are distinct only as to their timing requirements, that is, at what appropriate stage of the trial are they raised, and are similar in their design to achieve an underlying purpose of having the record of trial reveal the factual and legal basis for each decision— be it made upon motions, special findings on the ultimate issue entered by a military judge, or findings entered by members after proper instructions—we discern no reasons why the general legal principles and requirements which define R.C.M. 918(b) should not also serve as the paradigm for application of R.C.M. 905(d).

■ We, therefore, hold that as to any motion raised under R.C.M. 905(d), which includes, but is not limited to, those decisions from which the Government has a right to appeal, a military judge must, whether the motion be granted or denied, set forth: (1) the specific facts found, based on the totality of the evidence introduced, which are relevant to and support his legal decision—not merely recite the evidence presented or state that the facts are not in dispute; (2) the legal basis for his decision; and, (3) any other statement which would serve to clarify his reason(s) for decision in order that an appellate court may determine whether he applied—or misapplied—appropriate legal standards and/or presumptions and whether his decision amounts to an abuse of discretion or legal error.[15] Additionally, it is of no moment that the evidence adduced at trial on the motion is not in dispute, for it is the importance of the specific facts found to support the ruling and the use made of those facts which is at the core of requiring a military judge to set forth his reasons for decision. This requirement obtains critical significance in the context of R.C.M. 905(d), for the Government right to appeal is severely diluted, if not rendered meaningless, when the courts to which the appeal lies do not possess fact finding powers for resolution of an issue addressed under R.C.M. 908(a). *See* R.C.M. 908(c)(2); Articles 62(b) and 67(d), UCMJ, 10 U.S.C. § 867(d).

## III

We have found it necessary to develop an understanding of the content of R.C.M. 905(d) because the nature of the issue addressed for resolution on this appeal requires an examination of the "essential findings" found by the military judge. We herein recite the statement of findings entered at trial:

M.J.: I don't know that any special findings of fact are necessary as I don't

---

14. If the defense is found, that is, the Government fails in its burden of disproving its existence, an acquittal results. In such case, findings or explanation are not required.

15. With the advent of the conditional plea, under R.C.M. 910(a)(2), as an exception to the waiver rule of R.C.M. 910(j), military appellate tribunals may be expected to review pretrial rulings adverse to an accused even where findings are based upon a guilty plea.

really see that any of the issues are in dispute. What concerns the court is not necessarily the totality of everything that was out there but what the Captain knew and was told. The evidence appears to indicate that other than the affidavit, which is a part of Appellate Exhibit VI, the Captain was told by the NISO agent that the informant had given a sworn statement and that he, the NISO agent, knew nothing pro or con concerning the informant's reliability or veracity.

The defense motion, which is not specific as I have no specific piece of evidence which has been marked and identified, so I take it that it's a general motion to suppress all evidence taken or seized pursuant to the warrant issued by the Commanding Officer of the USS KITTY HAWK on the 4th of June of 1984 concerning seizing items from the person of Charles Postle from apparently one of his lockers, specifically, the bunk locker. The motion to suppress is granted.[16]

■ An examination of these essential findings reveals that the military judge proceeded on the theory that, if facts are not in dispute, factual findings are not required. We have rejected such a restricted interpretation. In the context of this case, we are wholly unable to determine what facts, based on the entirety of the evidence presented, were used—or how they were used—by the military judge to support his ruling. As stated, under Article 62(b), UCMJ and R.C.M. 908(c)(2), we have no power to enter findings of facts.[17] We are, further, without clear insight into the legal basis—the conclusions of law—for the military judge's ruling. It appears that the military judge was applying the Aguilar-Spinelli test[18]—to the exclusion of any other standard—in resolving the motion. We have no understanding of whether the military judge, based on the evidence presented, found, as a fact and as a matter of law, that the commanding officer was, or was not, a "neutral and detached magistrate." The impact of such factual and legal determination will obtain significance later in this opinion. We are also unable to discern what standard the military judge applied in reviewing the determination of the commanding officer that probable cause existed in the instant case on the facts presented by SA Davis at the time of the request for search authorization.

■ Based on the reasoning recited by the military judge in ruling on the motion, we conclude that he rigidly and exclusively applied the technical "two-pronged test" of Aguilar-Spinelli and, thus, rejected the totality of the circumstances test set forth in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), reh'g denied, —— U.S. ——, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983). We need not entertain debate on whether Illinois v. Gates is applicable to the military or whether it is implicitly rejected by Rule 315(f)(2), Mil.R.Evid., as adopted in 1980. The issue was initially settled by the Court of Military Appeals in United States v. Tipton, 16 M.J. 283 (C.M.

---

**16.** Though the military judge employed the term "special findings" rather than "essential findings," there exists no question but that he was responding to the sua sponte duty imposed by R.C.M. 905(d) and Rule 311(d)(4), Mil.R.Evid.

**17.** To example the dilemma we face, we refer to a comment in our recitation of the evidence to the effect that the evidence was inconclusive concerning whether the commanding officer was advised of the name of the informant or merely acquainted with the latter's identity as a "crewmember." In the military environment, where a commanding officer personally holds disciplinary proceedings over the members of his command and personally makes the court-martial referral decision, obtaining background information on an informant—to include reviewing his service record—is not as critical as it is to a civilian magistrate faced with judging the credibility and veracity of an informant. The fact that a commanding officer does not know about a servicemember of his command is a factor that weighs heavily in determining that the "good citizen" rule, vice the "informant" rule, is the proper test for application in this threshold determination of probable cause. See Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

**18.** Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

A.1983). The 1984 amendment to Rule 315(f)(2), Mil.R.Evid., specifically adopted the *Gates* test for application to military justice practice. We can, therefore, conclude, as we do, that the military judge erred as a matter of law in failing to consider the issue presented by the motion in light of the two tests set forth in *Illinois v. Gates, supra,* and *United States v. Tipton, supra.* First, that "the Fourth Amendment's requirement for probable cause for the issuance of a [search authorization] is to be applied, not according to a fixed and rigid formula, but rather in the light of the 'totality of the circumstances' made known to the [commanding officer]." *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984). We are further, again adverting to the failure of the military judge to articulate the legal standards which governed his ruling, as required by R.C.M. 905(d), unable to determine whether his "after-the-fact scrutiny ... of the sufficiency of the affidavit ... [took] the form of *de novo* review" or an application of the "substantial basis" test— the second test enunciated in *Illinois v. Gates, supra.*[19]

▆▆ As we see no reason why the determination of a commanding officer in issuing a search authorization should not be paid the same "great deference by reviewing courts" accorded similar determinations by civilian magistrates, the "substantial basis" test—not a *de novo* review—would be the appropriate legal standard to apply. *IF* the military judge conducted a *de novo* review of the commanding officer's determination of probable cause, he erred as a matter of law.[20]

From what we have said above, it is clear that we are reversing the decision of the military judge on the grounds that the standards of *Illinois v. Gates,* and the mandate of Rule 315(f)(2), Mil.R.Evid., effective 1 August 1984, were rejected. It is also clear that, when the court again convenes pursuant to our order, the military judge will be required to consider the motion anew in light of *Illinois v. Gates,* Rule 315(f)(2), Mil.R.Evid., and *United States v. Tipton,* state the specific facts relied upon to support the ruling that will issue, as required by R.C.M. 905(d) and Rule 311(d)(4), Mil.R.Evid., and reveal the legal standards applied in reviewing the decision of the commanding officer and in resolving the motion.

IV

▆▆ Though we could conclude our decision on this appeal based on the error of law disclosed, we cannot ignore the fact that, in the trial proceedings to follow, the Government may urge the military judge to consider the motion in light of the "good faith" exception to the with-warrant aspect of the exclusionary rule of the Fourth Amendment, as enunciated in *United States v. Leon,* 468 U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard,* 468 U.S. ——, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). It can, in fact, be claimed that the issue as addressed to us for resolution by the Government on appeal, by referencing a "facially valid" search authorization, encompasses a consideration of *Leon.* We recognize that this exception was decreed after the Military

19. "[T]he traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates,* 103 S.Ct. at 2331.

20. In applying the two tests of *Illinois v. Gates* to the instant case, the following factors would bear consideration: that Draughn made his statement under oath; Draughn's acquaintance by identification and background with the white flaky substance; the opportunity of Draughn to observe appellee's conduct; that Draughn's statement, the affidavit of SA Davis, and the authorization were reviewed by a lawyer; that affiant Davis was under oath; the quantity of the substance observed and its manner of packaging; whether Draughn was a "good citizen" or an "informant"; whether the commanding officer was apprised of or acquainted with Draughn's name (*see* note 17, *supra*); whether Davis, by virtue of his experience, could verify that methamphetamines/"crank"/"crystal" were packaged as related by Draughn and whether such was conveyed to the commanding officer.

Rules of Evidence were promulgated. We further are aware of no military appellate decisions which have considered the application of the "good faith" exception within the context of military law. If the scenario addressed should reveal itself, we can well imagine that a ruling by the military judge to the effect that the exception does not apply to the military would be appealed by the Government. Therefore, in the interest of permitting this case to be resolved completely by the military judge at one session—rather than protracting the litigation of the motion through the course of multiple appeals—we set forth our views on the issue.

We are met at the outset with the following—and eminently logical—argument which can be advanced to support the view that the "good faith" exception does not apply to military law. "Evidence obtained as a result of an unlawful search or seizure … is inadmissible…." Rule 311(a), Mil. R.Evid. "A search or seizure is 'unlawful' if it was conducted … in violation of … rules [Mil.R.Evid.] 312–317." Rule 311(c)(1), Mil.R.Evid. "A search authorization … must be based upon probable cause." Rule 315(f)(1), Mil.R.Evid. "Probable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched." Rule 315(f)(1), Mil.R.Evid.[21] The contention which flows from this Rules recitation is that, if the probable cause determination does not meet the test in *Illinois v. Gates*, the search is unlawful and, therefore, the evidence, by virtue of the clear language of Rule 311(a), Mil.R.Evid., is inadmissible. As "good faith" does not appear as an exception to the "statutory" rule of inadmissibility, it cannot be applied in the military.

The logic of this argument cannot be discounted out-of-hand. Especially is this true where to conclude otherwise is to open a court to attack on the ground that its

interpretation of the law is nothing more than judicial legislation—an exercise of power which we believe to be the antithesis of that granted courts created under Article I of the United States Constitution. We recite this admonition of restraint purposely to signify the caution with which we have approached the determination of this issue.

We conclude that the "good faith" exception enunciated in *Leon* does apply to military jurisprudence. Having stated our opinion, we now enumerate the considerations and reasoning which lead us to this conclusion.

■ 1. At the time of their adoption, Rules 301 and 304 through 321, Mil.R. Evid., were intended to state the then existing state of constitutional law on the issues of self-incrimination, search and seizure, wiretapping, and eyewitness identification. It was, however, recognized that the law of the Constitution is a fluid and dynamic law—subject to the interpretations of the United States Supreme Court based on considerations of a changing society and the demands occasioned by such changes—not an archaic set of principles that "rule from the grave." The drafters, well aware of this flexibility in the Constitution—and the unpredictable vagaries of its interpretation—must have intended that rules of evidence enacted to incorporate the then extant constitutional principles on the subjects addressed be interpreted with equal flexibility. These "constitutional rules" of the Military Rules of Evidence were intended to keep pace with, and apply to the military, the burgeoning body of interpretative constitutional law—including what it does, or does not, require—not to cast in legal or evidentiary concrete the Constitution as it was known in 1980. If this be so, which we believe it to be, then the "constitutional rules" of the Military Rules of Evidence, interpreted with the flexibility demanded, can be viewed as incorporating the *Leon* "good faith" exception to the

---

**21.** The drafter's analysis equates this language with the totality of the circumstances test of

*Illinois v. Gates.*

exclusionary rule—an example of what the Constitution does not require, that is, application of the exclusionary rule solely on the ground that the magistrate blundered.

2. Evidence of this flexibility in interpreting the "constitutional rules" of the Military Rules of Evidence is contained within, and in fact is exemplified by, the decision in *United States v. Tipton, supra.* If Rule 315(f), Mil.R.Evid., as in effect at the time of the *Tipton* decision, had been interpreted in light of constitutional law extant in 1980, the outcome would have been predicated on the technically rigid "veracity" and "basis of knowledge" rules of *Aguilar-Spinelli.* Such was not the case. In applying the test of *Illinois v. Gates* in *Tipton,* the Court of Military Appeals recognized the flexibility of our "constitutional rules" of the Military Rules of Evidence and the desirability that military law be the servant of the Constitution—not its master. We, thus, have precedent from our highest military tribunal which adopted the flexibility standard of interpretation as applied to Rule 315(f), Mil.R.Evid. Interpretative consistency necessitates that this approach be embraced for application to the analysis of Rules 301 and 304 through 321, Mil.R.Evid., as well.

3. It can be contended that the "great deference" accorded to probable cause determinations of civilian magistrates should not be applied to similar determinations by a commanding officer because such officer, charged by Navy Regulations with maintaining the discipline of his command, and possessed of a greater interest in ferreting out crime than his civilian counterpart—the "stake" in the outcome of criminal prosecutions of offenses committed within the command—may not be "neutral and detached." Though military decisional law has come close to incorporating a *per se* rule of disqualification based on the neutral and detached concept, the law remains—fortunately—that whether a commanding offi-

cer, or other official issuing a search authorization, is neutral and detached is fact determinative.[22] As stated earlier, we see no sound reason for not applying to the probable cause determination of a commanding officer the same deference accorded a similar decision by a civilian magistrate. However, whether or not an aura of suspicion—whether articulated or latent—surrounds the concept of treating a commanding officer as a "neutral and detached" magistrate does not detract from, or argue against, application of the "good faith" exclusion to his decisions. A reading of *Leon* clearly indicates that there are indeed exceptions to its "good faith" exception:

Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware,* 438 U.S. 154, 57 L.Ed.2d 667, 98 S.Ct. 2674 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well-trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois,* 422 U.S. [590] at 610–611, 95 S.Ct. 2254 [2265–2266], 45 L.Ed.2d 416 (POWELL, J., concurring in part); see *Illinois v. Gates, supra,* [462 U.S.] at [260], 103 S.Ct. 2317 [at 2343], 76 L.Ed.2d 527 (WHITE, J., concurring in the judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—

---

**22.** *See, United States v. Ezell,* 6 M.J. 307 (C.M.A. 1979); *United States Cordero,* 11 M.J. 210 (C.M. A.1981).

i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *Cf. Massachusetts v. Sheppard, post* [468 U.S.], at [——], 104 S.Ct. [at 3429], 82 L.Ed.2d [at 744].

*Leon,* —— U.S. at ——–——, 104 S.Ct. at 3421–22, 82 L.Ed.2d at 698–99.

Thus, the suspicions recited above can be laid to rest, for they have been checked by the limitations of the "good faith" rule. If the commanding officer, in fact, departs from his neutral and detached role and becomes partial, in a legal sense, to the prosecution in determining whether probable cause exists, the "good faith" exception would not apply. A check deemed sufficient by the Supreme Court to control a prosecutorially-bent magistrate should be sufficient for the same purpose in the military environment.

■■■ 4. There is but one, and the same, Constitution which controls federal civilian and military practice—not two, as in cases arising in state courts. A decision of the Supreme Court expounding upon and articulating the reach of a constitutional provision is binding on lower federal civilian courts. They are not at liberty to interpret the Constitution at variance with such a decision or to classify as constitutionally mandated that which the Constitution does not require. In the absence of a strong showing to the contrary, military courts, being created under the same Constitution, should be similarly bound.

■■■ 5. It must not be lost sight of that the Fourth Amendment's proscription is against *unreasonable* searches and seizures—not all invasions of privacy. This concept is definitely carried over into the Military Rules of Evidence, and specifically into Rule 315(f)(2) where the "reasonable belief" standard upon which a probable cause determination is based is reinforced. The four exceptions set forth in *Leon* to its "good faith" rule are, in reality, statements of conduct which transcend the line from the reasonable to the unreasonable. Therefore, a civilian magistrate's determination

of probable cause is reasonable, and the warrant issued by him can be reasonably presumed to be valid, if (a) he was not misled by false information in an affidavit; (b) the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" (c) the warrant is reasonably limited, on its face, to the scope of search authorization—the particularity requirement of the Fourth Amendment; and (d) the magistrate has not abandoned his role as a neutral and detached judicial officer. Conduct and determinations which are reasonable, or are classified as unreasonable, in the federal civilian courts in the context of the Fourth Amendment should—as a general rule, but subject to military exigencies and requirements non-existent in the civilian sector—be similarly reasonable or unreasonable in the military. It is, after all, but one Constitution that we are interpreting. With respect to Rule 315(f), Mil. R.Evid., it is, in our opinion, proper to interpret the term "reasonable belief" as being defined by, and to convey the intendment of, those opinions of the Supreme Court which declare what acts and determinations are reasonable under the Fourth Amendment. Under this analysis, a search authorization issued by a commanding officer which fits within the parameters of the "good faith" exception would be one based on "reasonable belief" and, thus, conform to the statutory language of Rule 315(f)(2), Mil.R.Evid. This view also comports with the purpose of the Military Rules of Evidence as stated in Rule 102—the "promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined."

6. The concept that the exclusionary rule is one of constitutional origin and dimension, if not repudiated, at least no longer obtains a majority following of the Supreme Court. That rule is no more than a purpose-oriented rule of evidence—the sole purpose for its judicial creation being to control, by deterrence, unlawful police conduct. It was not, and arguably never

was, intended to "punish the errors" of the judicial officer issuing the warrant or authorization to search. Like any rule of evidence, the exclusionary rule should be interpreted in order to serve and accomplish the purpose for which it was, and is, designed. If the purpose of the rule is not so served, the justification for its existence ceases. Further, if evidence is excluded by reliance on such a rule of evidence, but the ground upon which the determination of inadmissibility is based bears no relation to the purpose of the rule, then it ceases to be a rule of law and becomes, instead, a rule of predilection. We are advised by Rule 101(b), Mil.R.Evid., to apply the federal rules of evidence when the military rule is silent on an issue and when application of the federal rule would be both practicable and not inconsistent with or contrary to the UCMJ. Adoption of the "good faith" exception as an adjunct to the rules set forth in the Military Rules of Evidence meets each of these threshold conditions to application within military practice. Police misconduct remains subject to containment by the exclusionary rule, as revealed in Rules 311 through 315, Mil.R.Evid. The search authorizing official's conduct is deterred only when, by not fulfilling his role in good faith, he becomes more a policeman than a judicial officer. Thus, the purpose of the exclusionary rule is maintained, without dilution.

 7. The consideration of two general statements of law has been central to the development of our decision. The first such statement is that where the Constitution and a statute conflict, or may be perceived to conflict, the Constitution prevails. The second general concept is ·one which has long been part of the foundations of military law: Notwithstanding the interpretative limitations to the exercise of a constitutional or statutory right, Congress and/or the President can require that a more solicitous and expansive rule for the protection of such rights be applied within the military. Perhaps the most obvious example is that evidenced by comparing the self-incrimination provision of the Fifth Amendment with the rights contained in Article 31, UCMJ, 10 U.S.C. § 831. *See*, for example, Rule 301(a), Mil.R.Evid. Indeed, this general statement is much of what is at the root of the concept of "military due process."

Application of any general rule must be circumspect in order that the principle it conveys, or the right it protects, if any, be not ill-served or distorted by over-extension. These two general rules can be easily reconciled within the context of the subject under consideration. Where the Constitution establishes a right that vests in the individual as a private right, it must be accorded—statutory language to the contrary notwithstanding.[23] A rule-making body, be it a federal or state legislature or, in the case of the military, Congress and the President, can, however, enact a broader rule designed to protect the individual private right to an extent not required by the United States Constitution. In such a case, the courts and the public must accede to the desires of the legislature. This is to be distinguished from a rule of law predicated upon an interpretation of the Constitution which has for its purpose the protection and/or enforcement of a public right—"to enforce ideals of governmental rectitude." As to the latter, where the individual's private right bears no relation to the purpose for which the public right is created and maintained, he should possess no enforceable or beneficial interest in the remedy designed to effectuate that purpose. This concept, as it applies to the Fourth Amendment, and the attendant exclusionary rule, is clearly and concisely stated in *Leon:*

> The wrong condemned by the Amendment is "fully accomplished" by the unlawful search or seizure itself, ... and the exclusionary rule is neither intended nor able to "cure the invasion of the

---

**23.** This is, of course, subject to the qualification that a Constitutional right enjoyed by a civilian might not be possessed by a person in uniform.

defendant's rights which he has already suffered." [Citation omitted.] The rule thus operates as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the person aggrieved." [Citation omitted.] Whether the exclusionary sanction is appropriately imposed in a particular case ... is "an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct."

*United States v. Leon,* 104 S.Ct. at 3412.

■ The Fourth Amendment's right to privacy is a personal constitutional right. The personal remedy for its invasion lies elsewhere than in the exclusionary rule. The exclusionary rule is a public remedy, to be applied on behalf of society to protect its right to police conduct which does not transcend the law. To the extent, therefore, that Rules 311 through 321, Mil.R. Evid., are designed to protect an individual servicemember's personal constitutional right to privacy, that protection is not diminished, and the intent of those Rules is not emasculated, by an interpretation which does no more than define—perhaps even adjust—the extent of the military society's right to reject, and remedy for, "police" misconduct. Application of the "good faith" exception to the exclusionary rule to the military neither infringes, nor works an injustice upon, any personal right granted to a military accused by either the Constitution or the Military Rules of Evidence.

For the reasons and considerations stated above, we hold that the "good faith" exception to the exclusionary rule, together with the explicit exceptions thereto, as pronounced in *United States v. Leon, supra,* is applicable within the military justice system and must be analyzed and applied by military judges in resolving Fourth Amendment questions.

## V

The Government appeal is granted. The decision of the military judge which excluded the evidence seized from the possession of appellee pursuant to a search authorization issued by the Commanding Officer, USS KITTY HAWK, on 4 June 1984, is reversed. Charge II is ordered reinstated. The case is remanded to the military judge for further proceedings not inconsistent with this opinion.

■ We recognize that this opinion announces new concepts of law and amplifies upon current rules of procedure. In order to assist the military judge in the conduct of the proceedings herein ordered, we offer procedural suggestions which may be of benefit. Based upon the evidence of record, the military judge should determine whether a violation of the Fourth Amendment and the Military Rules of Evidence occurred, in light of the standards, both for determining probable cause by the commanding officer and for reviewing that determination, set forth in *Illinois v. Gates* and *United States v. Tipton.* If it is determined that a violation did occur, the military judge should next decide whether the "good faith" standard was met under the circumstances. In the factual context of this case, this would necessitate both a factual and legal determination as to whether the commanding officer was "neutral and detached." The military judge, if he deems it necessary to his decision, may, in his discretion, order the production of additional evidence on either issue. At the time of announcing his ruling, the military judge will state, upon the record: the facts found which he deems essential to support his ruling; the use made of particular evidence; and, the legal standards applied, and his rationale for their application in assessing the existence of probable cause, in reviewing the decision of the commanding officer to issue the search authorization, and, if applicable, in determining the presence, or absence, of good faith on the part of the affiant or commanding officer.

Senior Judge GREGORY and Judge MITCHELL concur.