512

**UNITED STATES**

v.

**Richard SOLORIO, Yeoman First Class, U.S. Coast Guard.**

**Misc. Docket 004–85.**

U.S. Coast Guard Court of Military Review.

24 Sept. 1985.

Military Judge: CDR Paul M. Blayney, USCG.

Trial Counsel: LCDR Frank E. Couper, USCG.

Defense Counsel: LT. Andrew M. Hochberg, USCGR.

Appellate Defense Counsel: LCDR Robert Bruce, USCG.

Appellate Government Counsel: LCDR Thomas J. Donlon, USCG.

OPINION OF THE COURT ON APPEAL OF THE GOVERNMENT FROM DISMISSAL OF CHARGES AND SPECIFICATIONS BY THE TRIAL JUDGE

BAUM, Chief Judge:

This is the Coast Guard's first action under Article 62, UCMJ, 10 U.S.C. § 862, which became effective August 1, 1984 and authorizes appeals by the Government from certain orders and rulings of a military judge not amounting to findings of not guilty. The ruling from which the Government has appealed grants defense counsel's motion to dismiss various charges and specifications for lack of jurisdiction. In so ruling, the trial judge applied to the facts the doctrine of "service connection," ·first proclaimed in O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) and amplified later in Relford v. Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971) and Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

In O'Callahan v. Parker, supra, the U.S. Supreme Court, analyzed the reach of court-martial jurisdiction for offenses committed within United States territorial limits during peacetime and rejected the Government-advanced argument that liability for trial by court-martial is simply "a question of 'status'—'whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term "land and naval forces." ' " 395 U.S. 267, 89 S.Ct. 1688 (quoting Kinsella v. Singleton, 361 U.S. 234, at 241, 80 S.Ct., at 301). Instead, the Court said, "that is merely the beginning of the inquiry, not its end. 'Status' is necessary for jurisdiction; but it does not follow that ascertainment of 'status' completes the inquiry, regardless of the nature, time, and place of the offense." Id. The Court went on to say, "the crime to be under military jurisdiction must be service connected...." 395 U.S. 272, 89 S.Ct. 1690. Since then, for offenses during peacetime committed inside the territorial limits of the United States, both person and offense must be found to be within a court-martial's ambit in order for there to be a trial. In making such determinations, military courts to this day have repeatedly faced the question of what must be shown to establish "service connection." See generally the recent cases of U.S. v. Griffin, 21 M.J. 501 (A.F.C.M.R.1985); U.S. v. Wilson, Misc.Dkt.No. 85–08, (N.M. C.M.R. 20 August 1985); U.S. v. Benedict, 20 M.J. 939 (A.F.C.M.R.1985); U.S. v. Roa, 20 M.J. 867 (A.F.C.M.R.1985); U.S. v. Kyles, 20 M.J. 571 (N.M.C.M.R.1985); U.S. v. Holman, 19 M.J. 784 (A.C.M.R.1984), U.S. v. Wojciechowski, 19 M.J. 577 (N.M.C. M.R.1984).

Assistance in making that judgment was provided in 1971 in Relford v. Commandant, supra, when the Supreme Court established a guideline for finding "service connection" and in the process carved out a service connected area where courts-martial are always appropriate, holding, "that when a serviceman is charged with an offense committed within or at the geographical boundary of a military post and violative of the security of a person or of prop-

erty there, that offense may be tried by a court-martial." 401 U.S., 369, 91 S.Ct. 657.

All the dismissed offenses in the instant case were violations of the security of persons but they were not committed within or at the geographical boundary of a military post. They allegedly occurred in the accused's privately owned home eleven miles from the Federal Office Building in downtown Juneau, Alaska where he worked on the staff of Commander, Seventeenth Coast Guard District. The charges and specifications allege various offenses against two young girls, including attempted rape; indecent and simple assaults; lascivious acts; and indecent liberties. The alleged victims were between the ages of ten and twelve during the period when the offenses supposedly occurred. The fathers of these girls were also active duty members of the Coast Guard and they, too, were assigned to the Coast Guard District Commander's staff. They, also, lived in civilian housing, one next door to the accused and his family and the other a half mile away, there being no government quarters in Juneau for anyone other than the District Commander.[1]

A friendship had grown between the accused and both of the other families, grounded in one case, on the common sporting interests of bowling and basketball, and, in the other, on the proximity of living next door. The alleged victims came to the accused's home on a regular basis to visit with his two sons. Both girls at one time played on a soccer team coached by the accused and they also bowled in a league in which the accused was active. During their stay in Juneau, the girls displayed behavioral changes that concerned and perplexed their parents, and, as a result, counseling was commenced for one girl. Whatever was causing such changes remained undetermined at the time, and the girls never made known the acts allegedly committed by the accused while they were in Juneau. It was not until all parties had been permanently transferred to different Coast Guard duty stations outside Alaska that any offenses came to light. They were first revealed when one of the girls confided in a school counselor. After that, the matter was reported to Coast Guard authorities and an investigation was commenced. Initially, the other girl, who happened to be the one who received counseling in Juneau, refused to discuss the events with her parents. She continued to be silent with them, until she and her parents went to New York for the Article 32, UCMJ investigation hearing which had been convened to determine whether a general court-martial was warranted. Both of the girls and their parents are now undergoing counseling/therapy as a result of the matters alleged to have occurred.

The accused is assigned to Commander, Coast Guard Group New York at Governors Island, New York, a Coast Guard base, where he lives in Government quarters and where the instant general court-martial was convened by the senior Coast Guard officer at Governors Island, Commander, Third Coast Guard District. In

---

1. We judicially note that in Juneau there was no base or post for Coast Guard personnel of the kind referred to in *O'Callahan* and *Relford, supra*, that is, a large military controlled enclave where many service personnel live and work. The closest equivalent in Juneau was the Coast Guard Station, a small 1.3 acre facility with a complement of fourteen enlisted persons, without berthing and messing accommodations, but including, at the time in question: a pier for two boats and a Coast Guard buoy tender; one building for watchstanders which also housed a small exchange and two recreational clubs; and one open structure utilized as a covered work area for boat crews. Over two hundred Coast Guard military personnel were assigned to the District Commander's staff, occupying four of the nine floors of the Juneau Federal Office Building, where Federal court spaces, along with offices for various other Federal civilian agencies, were also located. The Coast Guard Marine Safety Office situated in a building adjacent to the Federal Office Building had a military allowance of seventeen persons. With the possible exception of some of the complement of six officers and forty-nine enlisted personnel on the buoy tender, all of the approximately three hundred Coast Guard military personnel in Juneau lived in the civilian community. This Coast Guard presence in Juneau is far less than the military concentrations found at typical installations of the other services, but not an insignificant number by Coast Guard standards, despite the lack of a base or post to house them.

addition to the charges which have been dismissed, eight similar offenses, involving two other minor dependent daughters of Coast Guardsmen, were also referred to trial. These remaining offenses are alleged to have occurred in quarters on base at Governors Island after the accused's transfer from Juneau. The Assistant District Attorney, Criminal Division/First Judicial District, State of Alaska, writing for the Attorney General, has stated in appellate exhibit IX of the record, "that the Department of Law, Criminal Division, State of Alaska, will defer the prosecution of Yeoman First Class Richard Solorio, United States Coast Guard, to the legal prosecutional arm of the Coast Guard," citing as one of the reasons for this action, the expense and difficulty involved in investigating and prosecuting a case where the alleged victims have been transferred from Alaska.

With this factual setting, we now must determine whether or not the judge was correct in dismissing the charges. In answering that question, two recent Court of Military Review decisions bear consideration. In *U.S. v. Wilson, supra,* the Navy-Marine Corps Court of Military Review also faced an appeal by the Government from a military judge's ruling dismissing charges for lack of subject matter jurisdiction. In that case, the Court reversed the trial judge, finding there to be "service connection" in the off-base forcible sodomy and assault by a sailor on his active duty Army wife. Distinguishing features of fact prevent us from relying on the action of that Court, but we do agree with the emphasis placed by the Court on finding a distinct and greater interest in prosecuting by the military when compared with the interest of civilian authorities. The Air Force case of *U.S. v. Benedict, supra,* is closer to ours factually, involving, as it did, off-base indecent acts with a ten year old

daughter of Air Force active duty parents, which the civilian authorities passed to the military for prosecution. The only significant difference between *Benedict,* and our case is the posture of review. In *Benedict,* the trial judge found "service connection" and the case was before the Air Force Court in the normal course of review under Article 66, UCMJ, permitting factual determinations at the appellate level, if necessary. On the other hand, we are bound by certain facts found at the trial level unless we determine that the judge's findings were incorrect as a matter of law.[2] With respect to the legal issue of service connection, the Court in *Benedict* rejected, as controlling, a series of early decisions by the Court of Military Appeals that found no "service connection" for off-base sexual offenses involving civilian dependents of military personnel. *U.S. v. McGonigal,* 19 U.S.C.M.A. 94, 41 C.M.R. 94 (1969); *U.S. v. Shockley,* 18 U.S.C.M.A. 610, 40 C.M.R. 322 (1969); *U.S. v. Henderson,* 18 U.S.C.M.A. 601, 40 C.M.R. 313 (1969). The Air Force Court based its rejection of these cases on more recent Court of Military Appeals and Courts of Military Review opinions which it saw as dramatically redefining the scope and parameter of military jurisdiction. *Murray v. Haldeman,* 16 M.J. 74 (C.M.A. 1983); *U.S. v. Lockwood,* 15 M.J. 1 (C.M.A. 1983); *U.S. v. Trottier,* 9 M.J. 337 (C.M.A. 1980); *U.S. v. Shorte,* 18 M.J. 518 (A.F.C. M.R.1984) affirmed by USCMA summary disposition on August 13, 1985; *U.S. v. Roa, supra.* We agree with the Air Force Court that these cases support an expanded view of court-martial jurisdiction. However, we believe it useful to turn, again, to the basic guidance provided by the Supreme Court in *Relford.*

■ In addition to the 12 elements inherent in the *O'Callahan* holding, the Court in *Relford, supra,* stressed nine other important criteria for consideration in making

---

**2.** Article 62(b), UCMJ, 10 U.S.C. § 862(b), provides that on appeal by the United States of an order or ruling of the military judge, "the Court of Military Review may act only with respect to matters of law, notwithstanding section 866(c) of this title (Article 66(c))." This latter article authorizes Courts of Military Review, in the course of acting on findings of guilty and sentences, to "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact...." Article 66(c), UCMJ, 10 U.S.C. § 866(c).

"service connection" determinations on a case by case basis. Quoting from *Relford*, with footnotes and citations omitted, those nine factors are:

(a) The essential and obvious interest of the military in the security of persons and of property on the military enclave.

(b) The responsibility of the military commander for maintenance of order in his command and his authority to maintain that order.

(c) The impact and adverse effect that a crime committed against a person or property on a military base, thus violating the base's very security, has upon morale, discipline, reputation and integrity of the base itself, upon its personnel and upon the military operation and the military mission.

(d) The conviction that Article I, § 8, Cl. 14, vesting in the Congress the power "To make Rules for the Government and Regulation of the land and naval Forces." means, in appropriate areas beyond the purely military offense, more than the mere power to arrest a serviceman—offender and turn him over to the civil authorities. The term "Regulation" itself implies, for those appropriate cases, the power to try and to punish.

(e) The distinct possibility that civil courts, particularly non-federal courts, will have less than complete interest, concern, and capacity for all the cases that vindicate the military's disciplinary authority within its own community.

(f) The very positive implication in *O'Callahan* itself, arising from its emphasis on the absence of service-connected elements there, that the presence of factors such as geographical and military relationships have important contrary significance.

(g) The recognition in *O'Callahan* that, historically, a crime against the person of one associated with the post was subject even to the General Article. The comment from Winthrop, *supra*,

[W. Winthrop, Military Law and Precedents (2d ed. 1896), 1920 Reprint] at 724:

"Thus such crimes as theft from or robbery of an officer, soldier, post trader, or camp-follower * * * inasmuch as they directly affect military relations and prejudice military discipline, may properly be—as they frequently have been—the subject of charges under the present Article. On the other hand, where such crimes are committed upon or against *civilians*, and not at or near a military camp or post, or in breach or violation of a military duty or order, they are not in general to be regarded as within the description of the Article, but are to be treated as civil rather than military offenses." (Footnotes omitted.)

cited both by the Court in *O'Callahan*, 395 U.S., at 274 n. 19, 89 S.Ct., at 1691 and by the dissent at 278–279, 89 S.Ct., at 1693–1694, certainly so indicates and even goes so far as to include an offense against a civilian committed "near" a military post.

(h) The misreading and undue restriction of *O'Callahan* if it were interpreted as confining the court-martial to the purely military offenses that have no counterpart in nonmilitary criminal law.

(i) Our inability appropriately and meaningfully to draw any line between a post's strictly military areas and its nonmilitary areas, or between a serviceman-defendant's on-duty and off-duty activities and hours on the post.

401 U.S. 367–369, 91 S.Ct. 656, 657.

At the completion of its analysis, the Court in *Relford* said:

"We recognize that any *ad hoc* approach leaves outer boundaries undetermined. *O'Callahan* marks an area, perhaps not the limit, for the concern of the civil courts and where the military may not enter. The case today marks an area, perhaps not the limit, where the court-martial is appropriate and permissible.

What lies between is for decision at another time."

401 U.S. 369, 91 S.Ct. 657.

Thus, the question for this Court is whether the facts surrounding the instant offenses, lying somewhere between *O'Callahan* and *Relford,* provide sufficient *indicia* of "service connection" to allow trial by court-martial. The Air Force with similar facts, as noted, said, "yes," in *U.S. v. Benedict, supra.* The military judge here said, "no," finding facts which indicated to him a lack of service connection. Now, we must determine whether his conclusion was correct or incorrect as a matter of law. In approaching this task, we must look carefully at the facts he found and, in the process, apply the *Relford* yardstick. Also of help in this regard is a statement by the Supreme Court in the later case of *Schlesinger v. Councilman, supra,* which placed particular emphasis on certain of the *Relford* factors. In that case the Court said:

> [The service connection] issue turns in major part on gauging the impact of an offense on military discipline and effectiveness, on determining whether the military interest in deterring the offense is distinct from and greater than that of civilian society, and on whether the distinct military interest can be vindicated adequately in civilian courts. These are matters of judgment that often will turn on the precise set of facts in which the offense has occurred.

420 U.S. 760, 95 S.Ct. 1314.

■ In evaluating the judge's findings of fact, as stated earlier, we are not free to exercise our normal fact finding authority. Instead, we are limited to acting only "with respect to matters of law." This, of course, is the same standard of review applicable to the U.S. Court of Military Appeals in every case considered by that Court, since Article 67(d), UCMJ, 10 U.S.C. § 867(d), says "The Court of Military Appeals shall act only with respect to matters of law." Accordingly, that Court's approach to issues in which questions of fact are integral and must, of necessity, be evaluated, should apply to this Court's process of review for Government appeals. In that regard, the standard set forth in *U.S. v. Middleton,* 10 M.J. 123 (C.M.A.1981), while relating to the facts surrounding an issue of search and seizure and the question whether an accused had consented to the search, seems particularly pertinent to the evaluation we must make of the facts relating to the legal conclusion of "service connection." In *Middleton,* the Court said:

> Whether consent was given must "be determined from the totality of all the circumstances." *[Schneckloth v. Bustamonte],* 412 U.S. [218] at 227, 93 S.Ct. [2041] at 2047 [36 L.Ed.2d 854 (1973)]. Frequently, it poses issues of fact; but the ultimate question of the existence of consent involves application of a legal standard and so is subject to appellate review. See *United States v. Faruolo,* 506 F.2d 490, 496 (2nd Cir.1974) (Newman, Dist. J., concurring). Thus, while always viewing the facts in the light most favorable to the Government, [the prevailing party at the trial level] *see United States v. Lowry,* 2 MJ 55 (C.M.A. 1976), this Court has appropriately concerned itself with whether those facts in any given case support the conclusion of consent. *See, e.g., United States v. Gillis,* 8 MJ 118 (C.M.A.1979); *United States v. Aros,* 8 MJ 121 (C.M.A.1979); *United States v. Mayton,* 1 MJ 171 (C.M.A.1975); *United States v. Vasquez,* 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973). Nonetheless, to give due deference to the trial bench, a conclusion of consent reached below should not be disturbed unless it is unsupported by the evidence of record or was clearly erroneous. *United States v. Williams,* 604 F.2d 1102 (8th Cir.1979); *United States v. McCaleb* [552 F.2d 717 (6th Cir.1977)], *supra; United States v. Tolias,* 548 F.2d 277 (9th Cir.1977); *United States v. Griffin,* 530 F.2d 739 (7th Cir.1976). *See United States v. Vasquez, supra.*

Accordingly, we will give due deference to the findings of the trial judge, viewing the facts and evidence in a light most favorable to the accused who prevailed at trial, and will not disturb the judge's findings or

"service connection" conclusion unless unsupported by the evidence or clearly erroneous. Accord *U.S. v. Postle*, 20 M.J. 632 (N.M.C.M.R.1985).

Based on the evidence considered, the judge at trial found as fact that there was "a *de minimus* military relationship between the accused and the military fathers of the victims." He concluded that their relationship was "founded primarily upon the ages and activities of the children and additionally upon common sporting interests, common spousal interest and employment and neighborly relationships." The judge also included the following in his statement of "essential findings of fact":

> None of the alleged offenses posed a threat to any military installation....
>
> ....
>
> There is no essential interest of the military in the security of person or property on post in this case.
>
> ....
>
> No issue challenges the Commander's responsibility and authority to maintain order.
>
> There has been no demonstrated impact of the offenses on morale, discipline, the reputation or the integrity of the Coast Guard in Juneau, the personnel assigned there, nor on military operations or missions. The impact apparent in this case, that is, on the parents and the victims themselves is no different than that which would be produced by [a] civilian perpetrator.
>
> There has been no evidence suggesting a potential lessened interest, concern or capacity of civil courts to vindicate the military's disciplinary interest in prosecuting these offenses. To the contrary, Appellate Exhibit X [a Coast Guard message reporting conviction and sentencing in Alaska State Courts of two Coast Guardsmen on charges of sexual abuse of minors] suggests that civil courts in Alaska have recently produced results highly satisfactory to the military in similar cases....

> ....
>
> .... There has been no showing of diminished morale, discipline, or effectiveness within the military community in Juneau, Alaska.... I acknowledge a certain amount of logic in the judicial economy argument put forth by the Government and that political or economic considerations may support exercise by this Court of jurisdiction. However, those factors along with all others have not demonstrated a superior military interest in handling these offenses.... The impact of the alleged offenses, primarily reflected in the testimony of the service member parents of the victims, is that which might be expected of the victim of any crime of a similar nature, and while that impact may manifest itself in the work situation of those members, it does not rise to the level to compel the exercise of Court-Martial jurisdiction in these circumstances. In this regard, I note the increased caution of [sic] the parents [of the] victims may now exercise over their children, the requirements for counseling, anxiety, and time away from work for legal proceedings. These concerns would be the same whether the status of the offender were military or civilian....
>
> ....
>
> .... In light of the facts as found and in particular the reach of the Coast Guard Family Advocacy Program, I find that the Coast Guard interest in deterring these offenses is not distinct from that of civilian society and is less than that of civilian society, and what little if any distinct military interest there may be, can be adequately vindicated in civilian courts.

The judge supplemented these findings later and in so doing said *inter alia:*

> 4. Crime has an impact. The impact is felt on the victim and on those close to the victim. It is also reflected in the greater society of which the victim and offender are a part. Impact may be di-

rect or indirect. In this case there is no direct impact on the service. The indirect impact that exists is not sufficient to create service connection. That indirect impact consists of servicemember-parents['] preoccupation with family situation affecting the members['] performance, some initial counselling and referral from persons whose position it is to take such action, and time to participate in proceedings under the U.C.M.J. Good order, discipline, morale and welfare of servicemembers have not been directly impacted. Service reputation has not been adversely affected and those attributes of service reputation in a community which have been testified about, for example, credit worthiness, job stability for spouses, members['] and families['] access to community activities; would not be negatively impacted if these offenses were to come to light.

. . . .

6. The offenses alleged to have occurred in Alaska are significantly remote in time and place from those alleged to have occurred in New York.

■ In arriving at his findings, we believe the judge erred in several important respects. First, in finding that there has been no demonstrated impact of the offenses on morale and discipline in Juneau, he failed to properly take into account the changed circumstances resulting from the departure of all directly affected parties before the offenses became known. For the judge to base his decision on the observed effect, or lack thereof, in Juneau after the parties had left, rests the ultimate conclusion of whether jurisdiction is to be exercised on a distorted picture caused by military transfer. A more realistic reflection of the impact from such offenses could have been seen if the offenses had come to light while the accused, the victims and their families were still in Alaska. If impact on the command at Juneau is to be considered at all, it should be viewed from the perspective of the effect such offenses would have had if discovered at the time the fathers and the accused were assigned together on the staff of the District Commander. The offenses by their very nature contained within them the potential for a disrupting effect on good order and discipline on that staff. Accordingly, it was error for the judge to base his assessment of impact on the Juneau command solely on the observed effect after departure of all parties.

A more relevant finding in this area would pertain to the impact of these offenses on morale and discipline at Governors Island, where the accused is now stationed and living on base. The judge made no specific findings, however, with respect to the possible effect of the offenses on morale, good order and discipline within any command at Governors Island or on personnel under the authority and responsibility of the convening authority, Commander, Third Coast Guard District. Instead, he found the Alaska offenses to be "significantly remote in time and place from those alleged to have occurred in New York" and he concluded that none of the alleged Alaska offenses posed a threat to any military installation nor did they generate an essential military interest in the security of persons on post. Moreover, he found that, "[g]ood order, discipline, morale and welfare of servicemembers have not been directly impacted." With these conclusions, we must disagree. The offenses in Alaska were alleged to have occurred over a period of time up until June 30, 1984. The offenses in New York purportedly commenced as early as November 20, 1984. Characterization of the period between June and November as "significantly remote" is clearly erroneous. To the contrary, the asserted Alaska offenses were close enough in time and nature to those in New York to pose a real threat to the accused's military neighbors with young daughters. As such, they directly impacted upon good order, discipline, morale and welfare of servicemembers and their families. Furthermore, we believe, as a result and as a matter of law, the Coast Guard's interest in deterring these offenses is distinct from and greater than that of

the Alaskan authorities and that the judge erred in finding to the contrary.

■ We also disagree with the judge's conclusion that the concern of the parents in this case "would be the same whether the status of the offender were military or civilian." Such a conclusion overlooked the possible unique and distinct effect from the discovery by the fathers that a fellow Coast Guardsman may have committed violative offenses, of the nature alleged, upon their daughters and the natural expectation of the fathers that those in positions of authority and responsibility within the Coast Guard would take appropriate action to vindicate the outrage felt from such a grievous breach of faith by one shipmate towards another.

Finally, the judge's finding that "there has been no evidence suggesting a potential lessened interest, concern or capacity of civil courts to vindicate the military's disciplinary interest in prosecuting these offenses" is simply contrary to the evidence of record. Appellate exhibit IX, as indicated earlier, fully reflects that there is more than a potential lessened interest of the civil authorities; it documents an actual lessened interest because of the departure from Alaska of all of the interested parties. That is not to say that the appropriate civil authorities have no interest whatsoever in the case. In fact, through appellate exhibit XV, a stipulation of expected testimony of the assistant District Attorney who signed appellate exhibit IX, it is shown that their decision is subject to reconsideration. There is no assurance, however, that upon reconsideration the Alaskan authorities will decide to prosecute these offenses, even if the judge's dismissal for lack of military jurisdiction is allowed to stand upon final review. Appellate exhibit XV does not change the conclusion to be drawn from the current decision by Alaskan authorities deferring prosecution to the Coast Guard, i.e., the Coast Guard's interest in vindicating its disciplinary authority within its own community in this instance is greater than the interest the civilian prosecutors in Alaska may have in this matter. The judge's

reliance on appellate exhibit X for a contrary conclusion is misplaced. That exhibit merely reveals that in two other cases the civil authorities successfully prosecuted Coast Guard members in Alaska State Courts for sexual abuse of minors, without disclosing whether or not the accused and the witnesses were residing in Alaska at the time the offenses became known and without revealing what other aspects of service connection may or may not have been present. In any event, every case must rest on its own facts. The two prosecutions noted in appellate exhibit X certainly demonstrate that the Alaskan Courts were open and available but that simply does not change the facts with respect to the State's diminished interest in the case presently before this Court. For this reason, we conclude that the judge's finding of fact concerning that interest is clearly erroneous.

■ For further evaluation of the judge's legal conclusion that there was no "service connection," we look now to the *Relford* criteria enumerated earlier. Viewed from the perspective of the Coast Guard Commander in Juneau, it is clear that factors (a), (c), and (i), would not apply literally to the offenses since these factors relate to base security and offenses committed on a base. On the other hand, factor (a) may apply literally to Commander, Third Coast Guard District's decision to refer all the charges to trial. He has a legitimate, essential and obvious interest in the security of persons on the military enclave at Governors Island, where the accused now lives. Looking strictly at the offenses when they occurred, however, we note that, while the alleged crimes were not committed on or at the boundary of a base, they were violations against persons associated with one particular Coast Guard command. A command is more than a physical place or property; it is an organization of people. The commander's responsibility and authority for maintaining good order within his command relates to people, without regard to the physical attributes and location of the command. Ac-

cordingly, if we were to substitute the term "command" for "post" or "base" everywhere that those words appear in the nine *Relford* criteria, other than the quotes from Winthrop in factor (g), and the phrase "associated with a military command" for the phrases "on a military enclave," "on a military base," and "on the post" in (a), (c), and (i) respectively, it would then appear that all nine *Relford* factors would be relevant to the offenses when they were committed in Juneau. Such a substitution would seem appropriate in light of the unique facts presented here—a military presence without the traditional base—and in light of the language and thrust of the remaining six *Relford* factors, particularly factor (g) with its reference to categories of persons who accompany the military. It is unnecessary to make this substitution, however, which we leave for consideration to other courts and other opinions, because we believe the remaining criteria provide reason enough to conclude that there was service connection in this case as a matter of law.

In light of the earlier quoted statement from *Schlesinger v. Councilman, supra,* we believe this Court is justified in placing overriding importance on *Relford* factors (b) and (e), with their emphasis on the responsibility and authority of a military commander for maintenance of order in the command and the need to have court-martial jurisdiction to support that authority and responsibility when there is the possibility that civil courts, particularly non-federal courts, will have less than complete interest, concern or capacity for vindicating that authority. Here, the officer who convened this court-martial was confronted with allegations of sexual offenses against four minor Coast Guard dependents. The offenses against two of the girls occurred on a base under the authority of Commander, Third Coast Guard District, thereby, bringing into play all of the *Relford* factors

that validate his authority to maintain good order, discipline, and morale within his command through the exercise of court-martial jurisdiction. The similarity of the alleged on-base Governors Island offenses and the alleged off-base Juneau offenses, when viewed together, presents a pattern of behavior which poses a real threat to families now living in close proximity to the offender on-base at Governors Island. That threat and the impact it has upon morale, good order and discipline on the base challenges the responsibility and authority of the military commander for maintenance of order in his command. Thus, we disagree as a matter of law, with the judge's statement that in this case, "No issue challenges the Commander's responsibility and authority to maintain order," as well as the judge's conclusion that the factors presented in this case do not demonstrate "a superior military interest in handling these offenses," and his finding that there was "no direct impact on the service." The military commander in the situation encountered here has a compelling interest in determining as soon as possible whether the accused is guilty or not of *all* the alleged offenses and, if guilty, of ensuring that the proper forum takes appropriate action.[3] The only forum that can try all of these offenses is a court-martial. Alaskan courts have no jurisdiction over the Governors Island offenses. Moreover, the Commander with authority over that base could justifiably conclude that the interest of authorities in Alaska is less than complete with respect to the offenses committed there. Even without a letter so indicating, such a conclusion could be drawn easily enough from the knowledge that the accused and his alleged victims are no longer members of the Alaskan community. The paramount interest of the Coast Guard is clear from the fact that all of the parties were and still are members of the Coast Guard community. Commander,

---

3. See also RCM 203, MCM, 1984, where in subsection (b) of the discussion pertaining to that rule it is stated that, "where related on-base and off-base offenses are involved, there is a military interest in having all the offenses tried by court-martial, so that they can be disposed of together without delay. The existence of this interest helps provide a basis for finding service-connection for the off-base offenses."

Third Coast Guard District, as third ranking officer in the Coast Guard,[4] is in a position to safeguard the overall interests of the Coast Guard in this matter, as well as the unique concerns of his particular command at Governors Island. For all of these reasons, we have concluded as a matter of law that there is "service connection" with its resultant court-martial jurisdiction.

In arriving at this conclusion, we have accepted all facts found by the judge, not directly in conflict with our holding and not expressly rejected as unsupported or erroneous. As noted, however, the judge failed to make findings concerning the impact of the offenses on morale, good order, and discipline at Governors Island. In this regard, we believe that the impact is self evident from the nature of the offenses, the relationships of the parties and the accepted facts of record.

Our ultimate legal conclusion, we reiterate, is based on the following determinative factors: the common thread among all offenses of victims who are young dependent daughters accompanying and residing with their Coast Guard parents; the violative nature of the offenses which invokes the responsibility and authority of the military commander for maintaining security, order, morale and discipline within his command; and the less than complete interest, concern and capacity of civil authorities in vindicating the military commander's responsibility and authority in this regard. These factors impel us to conclude that the offenses are "service connected" and that the judge's ruling dismissing for want of jurisdiction must be reversed.

■ Having reached this conclusion, the Government's appeal is resolved. In so doing, we have treated certain supplemental findings of fact as validly entered into the record by the judge. The judge, after dismissing the charges and announcing his essential findings of fact in open session at Governors Island, New York, on June 4,

1985 also stated, "Subject to amendment and correction at the time of authentication those should constitute the essential findings of fact on that motion." Later, on June 20, 1985 at Washington, D.C., he signed a document denominated "Supplemental Essential Findings of Fact" and attached it to the record of trial sometime before authenticating the record on June 29, 1985. A copy was then provided to the trial counsel and defense counsel. Appellate Government Counsel challenges this document as not a proper part of the record of trial because it memorializes an invalid act outside a session of court and also that RCM 908, MCM, 1984, precludes further sessions of court with respect to the judge's ruling, after written notice of appeal is filed. In support of its argument that further proceedings were foreclosed, the Government cites *U.S. v. Browers*, 20 M.J. 542 (A.C.M.R.1985), a case where the Army Court of Military Review voided a finding of not guilty made by the judge after notice of appeal by the Government had been filed. We do not believe that the supplemental findings of fact in this case rise to the level of prohibited proceedings as found in *Browers*. Furthermore, we see no requirement for presenting the findings in open session as long as all parties are provided copies in a timely fashion. Accordingly, we do not agree with the Government that the supplemental findings in this case are invalid. We do agree, however, that adding such afterthoughts to the record can impede the expeditious filing by the Government of its appeal and brief. That did not happen in this case, as the Government filed its pleadings in a full and timely manner. In an appropriate case, however, late additional findings of fact may justify granting an enlargement of time for filing of the appeal by the Government, or other appropriate action.

The ruling of the military judge dismissing charges and specifications alleging offenses in Juneau, Alaska is reversed and

---

**4.** We judicially note that, Commander, Third Coast Guard District, VADM Paul A. Yost, USCG, is the third senior officer in the Coast Guard, ranking directly after the Commandant and the Vice Commandant of the U.S. Coast Guard.

those offenses are reinstated. The record is returned in order that the trial may proceed with the charges and specifications thus restored, along with the other charges and specifications that were not affected by the judge's ruling.

Judges BURGESS, LYNN and GRACE concur.

Judge BRIDGMAN concurring in part and dissenting in part.

I agree with the Court's holding that the trial judge erred, as a matter of law, in determining the impact of this offense on the morale and discipline of the Coast Guard in Juneau and that a determination should have been made as to the impact, if any, on the accused's present command and the Coast Guard community as a whole. In addition to the matters discussed in the majority opinion, I note that the judge's essential findings may have been based on an erroneous standard, where the judge stated "the impact of the alleged offenses ... does not rise to the level to *compel* the exercise of Court-Martial jurisdiction in these circumstances." [R–132] (emphasis added).[1] I also agree that the trial judge erred, as a matter of law, in his finding that there was no evidence suggesting a "lessened interest, concern or capacity" of the civil court in Alaska in the prosecution of these offenses.

Where I depart from the majority is the holding that there was "service connection" and therefore jurisdiction, in this case, as a matter of law. As noted by the majority, the judge made no specific findings with respect to the possible effect of the offenses at Governors Island or on personnel under the authority and responsibility of the convening authority. Even if this case were before us for review under Article 66(c), U.C.M.J., 10 U.S.C. § 866(c), I would hesitate to determine that jurisdiction exists in light of this omission. Although the Court of Military Appeals has sanctioned drawing reasonable inferences with respect to factual matters not fully developed in the record of trial to support court-martial jurisdiction, it has done so where jurisdiction was challenged for the first time at the appellate level. *U.S. v. Lockwood*, 15 M.J. 1 (C.M.A.1983). Since this case is before us for review under Article 62(b) U.C.M.J., 10 U.S.C. § 862(b), I do not believe we are empowered to cure an omission from the essential findings of the trial judge. Further, I would distinguish cases such as *U.S. v. Burris*, 20 M.J. 707 (A.C.M.R.1985) and *U.S. v. Poduszczak*, 20 M.J. 627 (A.C.M.R. 1985), where determination that the trial judge erred, as a matter of law, necessarily compelled a contrary finding of fact.

I am concerned that, in exceeding that which is necessary to dispose of the Government's appeal, we have lessened the requirement "that the Government fulfill its obligation under the law to meet the letter of the law." *U.S. v. Trottier*, 9 M.J. 337 (C.M.A.1980), (concurring opinion at 353). Accordingly, while I would grant relief to the Government and remand the charges to the trial court, I would do so without prejudice to the accused's right to renew his attack at the trial level and upon any further appellate review of the case. *Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983).

---

1. This may not accurately reflect the standard applied. In the supplemental essential findings the impact was found "not *sufficient* to create service connection" [page 2] (emphasis added).